ORAL ARGUMENT NOT YET SCHEDULED

No. 25-7029

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

QATAR NATIONAL BANK; QATAR CHARITY,

*Petitioners-Appellees*,

v.

PERLES LAW FIRM, P.C.,

*Respondent-Appellant.*

Appeal from the U.S. District Court for the District of Columbia
No. 1:24-mc-35, Hon. Loren L. AliKhan

## BRIEF FOR PETITIONERS-APPELLEES
## QATAR NATIONAL BANK (Q.P.S.C.) AND QATAR CHARITY

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
Tel: (202) 508-4600
Douglas.Hallward-
Driemeier@ropesgray.com

Michael G. McGovern
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
Michael.McGovern@ropesgray.com

*Counsel for Petitioner-Appellee*
*Qatar National Bank (Q.P.S.C.)*

John M. Hillebrecht
Kevin Walsh
Jessica A. Masella
Michael G. Lewis
Erin Collins
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Tel: (212) 335-4500
John.Hillebrecht@us.dlapiper.com
Kevin.Walsh@us.dlapiper.com
Jessica.Masella@us.dlapiper.com
Michael.Lewis@us.dlapiper.com
Erin.Collins@us.dlapiper.com

*Counsel for Petitioner-Appellee*
*Qatar Charity*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners-Appellees Qatar National Bank (Q.P.S.C.) and Qatar Charity certify the following:

**(a) Parties and *Amici*.**   All parties, intervenors, and *amici* appearing before the district court and in this court are listed in Respondent-Appellant's Certificate as to Parties, Rulings, and Related Cases.

**(b) Rulings Under Review.**   References to the rulings at issue appear in Respondent-Appellant's Certificate as to Parties, Rulings, and Related Cases.

**(c) Related Cases.**   This case has not previously been before this Court or any court other than the district court.   There are no cases that involve the same parties and that are related to this case.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Qatar National Bank (Q.P.S.C.) has no parent corporation, and no public corporation owns 10% or more of the shares of it.

Qatar Charity has no parent corporation, and no public corporation owns 10% or more of the shares of it.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY ....................................................................................viii

INTRODUCTION ..............................................................................1

STATEMENT OF ISSUES ................................................................8

STATEMENT OF THE CASE ..........................................................10

    A.    The Parties ...........................................................................10

    B.    Perles Files an Array of Baseless Lawsuits Against Applicants in the U.S. District Court for the Eastern District of New York. ...........................................................11

    C.    Applicants Are Wrongfully Accused in the U.S. District Court for the Southern District of Florida of Supporting the Murder of Steven Sotloff. ..........................12

    D.    Applicants Identify Multiple Indicia of Forgery on the Face of the Purported Transfer Record. ..............................14

    E.    Perles Acknowledges That It Cannot Authenticate the Forged Record and Agrees to Move Jointly to Dismiss the Sotloff Action with Prejudice. .......................................17

    F.    Applicants Take Concrete Steps Toward Initiating Foreign Proceedings. .........................................................18

    G.    Perles Has in Its Possession, Custody, and Control Information Sufficient to Identify the Forgers...................20

    H.    The District Court Grants the Application Under 28 U.S.C. § 1782. .....................................................................21

SUMMARY OF THE ARGUMENT ...................................................25

STANDARD OF REVIEW................................................................28

ARGUMENT ....................................................................................30

I.    Perles's Lead Argument Regarding the Confidentiality Order Is a Red Herring, and the District Court Properly Rejected It. ..........30

A.     The Confidentiality Order Did Not Somehow Immunize from Future Discovery Underlying Facts Surrounding the Forged Record. .................................................. 30

B.     Issue Preclusion Does Not Apply Here. .............................. 35

II.    The District Court Properly Found That Applicants Satisfy the Statutory Requirements of 28 U.S.C. § 1782. ............................... 40

III.   The District Court Did Not Abuse Its Considerable Discretion in Finding the *Intel* Discretionary Factors Weighed in Applicants' Favor. ........................................................................................ 49

A.     Neither Perles Nor the Sotloffs Will Be Participants in the Foreign Proceedings. ...................................................... 49

B.     France and Its Courts Are Receptive to Evidence Obtained Under 28 U.S.C. § 1782. ...................................... 51

C.     The Application Does Not Conceal an Attempt to Circumvent Proof-Gathering Restrictions. .......................... 54

      1.     The Requested Discovery Is Not Barred by the Attorney Work Product Doctrine. .............................. 55

      2.     Perles's Argument Concerning Purported Security Risks Is Unsupported by Law or Fact. ...................... 61

D.     The Requested Discovery Is Neither Unduly Intrusive Nor Burdensome. ................................................................ 63

CONCLUSION .................................................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accent Delight Int'l,*
   791 F. App'x 247 (2d Cir. 2019) .......................................... 50

*Aenergy, S.A. v. Republic of Angola,*
   123 F.4th 1351 (D.C. Cir. 2024).......................................... 28

*In re Banco Mercantil Del Norte, S.A.,*
   126 F.4th 926 (4th Cir. 2025) ............................................ 28

*Bobby v. Bies,*
   556 U.S. 825 (2009).......................................................... 35

*In re Bracha Found.,*
   663 F. App'x 755 (11th Cir. 2016).................................. 29, 49

*Brodie v. Jackson,*
   2014 WL 11813594 (D.D.C. July 7, 2014), *aff'd*, 630 F.
   App'x 1 (D.C. Cir. 2015*)*.................................................. 39

*In re C5 Cap. Ltd.,*
   2024 WL 1701650 (D.D.C. Apr. 18, 2024) ......................... 43

*Carter-Wallace, Inc. v. Hartz Mountain Indus.,*
   92 F.R.D. 67 (S.D.N.Y. 1981) ........................................... 32

*Connors v. Tanoma Mining Co.,*
   953 F.2d 682 (D.C. Cir. 1992) ........................................... 38

*In re DiGiulian,*
   314 F. Supp. 3d 1 (D.D.C. 2018) ...................................... 54

*Drummond Co. v. Conrad & Scherer, LLP,*
   885 F.3d 1324 (11th Cir. 2018)......................................... 60

*In re Esses,*
   101 F.3d 873 (2d Cir. 1996) ............................................. 52

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F. 3rd 1095, 1100-01 (2d Cir. 1995)........................................ 52, 53

*Force v. Qatar Charity*,
  2025 WL 43163 (E.D.N.Y. Jan. 7, 2025)..................................... 12, 60

*Henkin v. Qatar Charity*,
  2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023)......................... 12, 60, 61

*In re Hulley Enters. Ltd.*,
  2017 WL 3708028 (D.D.C. Aug. 18, 2017)......................................... 41

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)........................ 7, 26, 41, 46, 47, 49, 50, 51, 52, 63

*Iowaska Church of Healing v. Werfel*,
  105 F.4th 402 (D.C. Cir. 2024)............................................................ 64

*Lazaridis v. Int'l Ctr. for Missing & Exploited Children*,
  473 F. App'x 2 (D.C. Cir. 2012)...................................... 29, 49, 50, 64

*Lugosch v. Pyramid Co. of Onondaga*,
  435 F.3d 110 (2d Cir. 2006) ................................................................ 32

*Meza v. Renaud*,
  9 F.4th 930 (2021) ...................................................................... 28, 29

*Pishevar v. Fusion GPS*,
  2025 WL 885115 (D.D.C. Mar. 21, 2025) ........................................... 48

*In re Pishevar*,
  2020 WL 8299764 (S.D.N.Y. Oct. 3, 2020) ........................................ 62

*In re Pishevar*,
  2023 WL 2072454 (D.D.C. Feb. 17, 2023) .............................. 42, 52, 54

*Pons v. AMKE Registered Agents, LLC*,
  835 F. App'x 465 (11th Cir. 2020)....................................................... 28

*In re Porsche Automobil Holding SE*,
  985 F.3d 115 (1st Cir. 2021) ............................................................... 28

vi

*Przewozman v. Qatar Charity*,
    2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) ...................................... 12

*Republic of Gambia v. Facebook, Inc.*,
    575 F. Supp. 3d 8 (D.D.C. 2021) ........................................................ 61

*In re Rigby*,
    2013 WL 622235 (S.D. Cal. Feb. 19, 2013) ........................................ 52

*Savignac v. Jones Day*,
    586 F. Supp. 3d 16 (D.D.C. 2022) ................................... 55, 56, 58, 59

*Sorenson Commc'ns, Inc. v. FCC*,
    765 F.3d 37 (D.C. Cir. 2014) ............................................................ 38

*In re Subpoena Duces Tecum Issued to Commodity Futures
    Trading Comm'n*,
    439 F.3d 740 (D.C. Cir. 2006) ..................................................... 35, 36

*United States v. All Assets Held at Bank Julius Baer & Co.*,
    270 F. Supp. 3d 220 (D.D.C. 2017) .................................................. 55

*In re Veiga*,
    746 F. Supp. 2d 8 (D.D.C. 2010) ........................................... 29, 41, 54

*Yamaha Corp. of America v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) .......................................................... 39

**Statutes**

28 U.S.C. § 1782 ........................................................... 7, 9, 26, 40

**Other Authorities**

Code civil art. 1240 (Fr.) ........................................... 20, 41, 45

Code de procédure pénale art. 441-1 (Fr.) ................... 20, 41, 45

18 James W. Moore et al., Moore's Federal Practice §
    132.02[2][3] (3d ed. 2008) ................................................................ 37

# GLOSSARY

| | |
|---|---|
| Anonymous Source | The individual located in Paris, France, who allegedly witnessed the non-existent transaction that was at issue in the jointly dismissed Sotloff Action (defined below) and who continues to maintain that the key bank transfer record is genuine |
| Applicants | Qatar National Bank (Q.P.S.C.) and Qatar Charity |
| Application | Qatar National Bank (Q.P.S.C.) and Qatar Charity's 28 U.S.C. § 1782 Application, filed March 12, 2024 |
| Confidentiality Order | The June 23, 2023 confidentiality order entered by Judge Middlebrooks in the jointly dismissed Sotloff Action (JA403-20) |
| Entry Order | The June 23, 2023 order entering the Confidentiality Order in the Sotloff Action (JA422-25) |
| Forged Record | The purported key bank transfer record that allegedly ties Qatar National Bank (Q.P.S.C.) and Qatar Charity to terrorists and that contains multiple indicia of forgery (JA335-37) |
| Forgers | The individual(s) who participated in forging and/or disseminating the Forged Record, including the Anonymous Source |
| Perles | Perles Law Firm, P.C. |
| Purported Transfer Record | The Forged Record, prior to the discovery of the record's inauthenticity (JA335-37) |
| QC | Qatar Charity |
| QNB | Qatar National Bank (Q.P.S.C.) |

| Sotloff Action | *Sotloff v. Qatar Charity, et al.*, No. 22-cv-80726 (S.D. Fla.) (Middlebrooks, J.) (dismissed with prejudice on joint motion of the parties) |
| SWIFT | Society for Worldwide Interbank Financial Telecommunication |

## INTRODUCTION

Petitioners-Appellees Qatar National Bank (Q.P.S.C.) ("QNB") and Qatar Charity ("QC," and together with QNB, "Applicants") are one of the largest commercial banks in the Middle East and a renowned charity, respectively.[1]  Applicants are the victims of a complex fraudulent scheme in which an unknown individual (or individuals) took advantage of a grieving family, the Sotloffs, by providing their counsel, Respondent-Appellant Perles Law Firm, P.C. ("Perles"), with a forged bank record (the "Forged Record") falsely linking Applicants to an alleged $800,000 wire transfer that supposedly facilitated a terrorist group's heinous murder of American journalist Steven Sotloff.  Relying on the Forged Record and acting on behalf of Sotloff's relatives, Perles filed a federal Anti-Terrorism Act lawsuit against Applicants in the U.S. District Court for

---

[1] Perles Law Firm's use of the phrase "the Qataris" on appeal—as an apparent epithet—is offensive.  To the extent the purpose of the term's use is to conflate Applicants with the government of the State of Qatar, that is also misplaced:  Applicants are *not* governmental entities but rather are a commercial bank and a charity.  *See* JA4 ¶ 5; JA392 ¶ 5.  In any event, the State of Qatar remains a "Major Non-NATO Ally" of the United States and a critical partner in a fraught region.  *See* JA231 (January 31, 2022 letter from the U.S. President, noting that he is "making this designation in recognition of Qatar's many years of contributions to U.S.-led efforts").

the Southern District of Florida in *Sotloff v. Qatar Charity, et al.*, No. 22-cv-80726 (S.D. Fla.) (Middlebrooks, J.) (the "Sotloff Action").

Although the Forged Record was the cornerstone of the complaint's assertion of liability against Applicants, Perles did not reproduce it in the complaint or attach it. Indeed, Perles withheld the Forged Record from Applicants, even after Applicants advised Perles that, despite diligent and comprehensive searches of their own databases and records, Applicants found no record of the alleged wire transfer. Perles only produced the Forged Record to Applicants after being ordered to do so by the court pursuant to a confidentiality order (the "Confidentiality Order").

After conducting an initial factual investigation, Applicants provided Perles overwhelming evidence that the document was forged. In particular, the Forged Record contains numerous, incontrovertible indicia of fraud, the most egregious of which are (a) listing a SWIFT (Society for Worldwide Interbank Financial Telecommunication) code that did not come into existence until years after the wire transfer the Forged Record purportedly records, and (b) repeatedly misspelling the Turkish word for "bank" in what purports to be a form Turkish bank

document.  Applicants also obtained confirmation from Ziraat Bank—the Turkish bank that supposedly received from QNB the wired funds reflected in the Forged Record—that, like QNB, Ziraat Bank had no record of any such wire transfer.  In short, Applicants gave Perles incontrovertible evidence that the bank record upon which the Sotloff Action depended was, in fact, a work of fiction.

In response, and after reportedly conducting its own investigation, Perles, on behalf of the Sotloff plaintiffs, conceded that it could not authenticate the record and agreed to move jointly with Applicants to dismiss the Sotloff Action with prejudice and to vacate the court's prior order denying Applicants' motions to dismiss (which order had relied in large part on the Forged Record).  JA339-70.  On September 29, 2023, Judge Middlebrooks granted the parties' joint motion and entered an order vacating his earlier opinion and dismissing the Sotloff Action with prejudice.  JA371-72.

Now, for the first time Perles appears to suggest, with no evidence in support and, indeed, contrary to the evidence that convinced it to abandon the Sotloff Action with prejudice, that the Forged Record "could actually be attributable to the chaotic environment surrounding a

multilingual group of terrorists and their supporters attempting to paper-over an illicit transaction while under time pressure." Br. 30-31. But why terrorists would want to "paper-over" a transaction in a manner that implicates them—and why Perles's "Anonymous Source" would claim to have witnessed the transaction, sign the Forged Record as a "witness" to the supposed transaction, and vouch for the record's authenticity—are questions that Perles conspicuously fails to answer in advancing this rank and irrational speculation.

In anticipation of filing civil and criminal claims in a foreign tribunal against those who perpetrated this fraud, which has caused Applicants to incur substantial legal fees and has wrongfully tarnished Applicants' reputations, Applicants brought an application under 28 U.S.C. § 1782 (the "Application") to take certain limited discovery of Perles regarding the identity of the individual or individuals who provided the Forged Record to Perles. While Applicants initially filed the Application on an *ex parte* basis in the U.S. District Court for the District of Columbia, Judge Loren L. AliKhan ordered that the Application be served on Perles to provide the firm an opportunity to oppose the Application. After consideration of Perles's arguments in opposition,

which largely mirror those that Perles advances on appeal, Judge AliKhan found for Applicants and against Perles *on all issues*, including issue preclusion, Section 1782's statutory requirements, and the discretionary factors analyzed under the Supreme Court's guidance in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). In short, this was not a close call for the district court in any respect.

Perles's brief on appeal is premised on the same mischaracterizations advanced below, including that Applicants seek discovery about "individuals who allegedly signed the Transfer Record as witnesses," Br. 12, as though the Forged Record were an authentic document and any names on it were of actual individuals who truly witnessed something. In other words, Perles seeks to continue the charade of treating the Forged Record as though it were genuine, rather than as the brazen, defamatory forgery that Applicants have proven it to be. Applicants are not interested in learning about any fictitious characters who might appear in the document, but rather seek to identify the fraudsters who were its authors and producers—the individuals who masterminded and carried out the fraudulent and defamatory scheme

against Applicants by creating the Forged Record and employing it against them.

Regarding Perles's lead argument, the fact that Judge Middlebrooks's Confidentiality Order allowed Perles to unilaterally redact certain information that Perles was, at the time, inaccurately representing to Judge Middlebrooks as genuine does not in any way restrict Judge AliKhan's ability to order discovery regarding the *source* of the Forged Record itself, which was never made subject to any confidentiality constraint. Courts have rejected the suggestion that redaction of a document in one proceeding somehow immunizes the facts underlying the redaction from being the subject of discovery in other proceedings. Nor does issue preclusion apply, given the key differences between the litigations of the Confidentiality Order and of the Application. The Confidentiality Order issue is nothing more than a red herring.

The district court appropriately saw through Perles's distractions and focused on the core of the Section 1782 analysis, namely Section 1782's statutory requirements as well as the *Intel* discretionary factors. Of the three statutory requirements, Perles challenges only the second

requirement:  that the requested discovery be sought "for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782(a). But Applicants have amply satisfied that requirement, as demonstrated by their declarations explaining that they intend to bring suit *at least* in France (and potentially additional jurisdictions) as well as the specific legal theories under which they intend to bring suit, which have been developed through legal analyses conducted by local French counsel engaged by QNB.  Applicants therefore have demonstrated *more* than what is needed to satisfy this requirement; the Supreme Court has explained that "the 'proceeding' for which discovery is sought under § 1782(a) must be in *reasonable contemplation*, but *need not be 'pending' or 'imminent.'*"  *Intel*, 542 U.S. at 247 (emphases added).  Moreover, Applicants cannot move forward with the foreign proceedings without the discovery they need from Perles.  The district court did not err in finding that Applicants have met their *de minimis* burden.

And regarding the *Intel* discretionary factors, the district court found for Applicants on *all four factors*, which analysis is reviewed by this Court under a deferential abuse-of-discretion standard.  *First*, neither Perles, nor the Sotloffs for that matter, will be a party to the

contemplated foreign proceedings. *Second*, there is no reason to believe that France and its courts will not be receptive to the evidence obtained under Section 1782 discovery. *Third*, there is no indication that Applicants are attempting to circumvent any foreign proof-gathering restrictions or other policies, and Perles's arguments regarding the attorney work product doctrine and security risks are unfounded. *Fourth*, the discovery requests that Applicants advance here are narrowly tailored—focusing precisely on the source of the Forged Record—such that the requests are neither unduly intrusive nor burdensome. Perles offers no reasoned basis to reach any contrary result, as the district court within its considerable discretion recognized. Because the Application falls squarely within the scope of Section 1782, this Court should affirm.

## STATEMENT OF ISSUES

1. Whether the district court erred in concluding that the Confidentiality Order entered in the U.S. District Court for the Southern District of Florida for the purpose of designating certain content of the Forged Record as "Attorney's Eyes Only"—before that district court was provided incontrovertible evidence that the bank record was forged—does

not preclude Applicants from seeking discovery under 28 U.S.C. § 1782

for narrow facts underlying the Forged Record, especially considering

that the parties filed a redacted version of the record on the public docket;

2. Whether the district court erred in concluding that Applicants

met their *de minimis* burden under the second of 28 U.S.C. § 1782's

statutory requirements—that the requested discovery be "for use in a

proceeding in a foreign or international tribunal," 28 U.S.C. § 1782(a)—

where Applicants sufficiently identified those whom they intend to

pursue claims against and in which specific foreign jurisdiction, hired

local counsel within that jurisdiction, and advanced legal theories of civil

and criminal liability through the aid and analyses of that local counsel;

3. Whether the district court abused its discretion in finding that

the *Intel* discretionary factors weighed in favor of granting the

Application, where: (1) neither Perles nor the Sotloffs will be a party to

the contemplated foreign proceedings; (2) there is no reason to believe

that a foreign court will not be receptive to the evidence obtained under

28 U.S.C. § 1782; (3) there is no indication that Applicants are attempting

to circumvent any foreign proof-gathering restrictions or other policies;

and (4) the discovery requests that Applicants advance are narrowly

tailored, such that the requests are neither unduly intrusive nor burdensome.

## STATEMENT OF THE CASE

### A.    The Parties

#### a.    Qatar National Bank

Founded in 1964, Petitioner-Appellee QNB is a commercial bank incorporated in Qatar and headquartered in Qatar's capital city, Doha. JA4 ¶ 5.  Today, it is the biggest bank in Qatar and one of the largest financial institutions in the Middle East and North Africa region.  *Id*. QNB has over 30,000 employees across 900 locations.  *Id*.  Over the last several decades, QNB has consistently been recognized by numerous renowned financial publications for its high-quality services and regional stature.  *Id*.

#### b.    Qatar Charity

Petitioner-Appellee QC is a charitable organization headquartered in Doha.  JA392 ¶ 5.  QC operates in over 70 countries, where it provides charitable relief to millions of deserving recipients.  *Id.* ¶ 6.  To carry out its charitable mission, QC regularly partners with governments, including the United States; global organizations, including the United Nations; and international non-profits, including the Bill & Melinda

Gates Foundation. JA393 ¶ 7. In recognition of its charitable work, QC has been praised by its partners, including senior U.S. diplomats who have regularly noted QC's positive impact around the globe, characterizing QC as "one of the best organizations in the world." *Id.* ¶ 8.

### c. Perles Law Firm, P.C.

Respondent-Appellant Perles Law Firm, P.C. is a Washington, D.C.-based law firm that filed suit against QNB and QC in the Sotloff Action in May 2022, only to move jointly with QNB and QC in September 2023 to dismiss that case with prejudice. JA4 ¶ 6; JA4-5 ¶ 7; JA7-8 ¶ 24.

### B. Perles Files an Array of Baseless Lawsuits Against Applicants in the U.S. District Court for the Eastern District of New York.

Before filing the ill-fated Sotloff Action, Perles filed numerous other meritless lawsuits against Applicants in the U.S. District Court for the Eastern District of New York, attempting to link Applicants to the activity of international terrorist groups. Two of those suits have already been dismissed in their entirety, and jurisdictional discovery in a third has produced no evidence to support the complaint's jurisdictional allegations. None of those complaints contained allegations *even remotely* tying Applicants to the acts of terrorism in question. *See Force v. Qatar Charity*, 2025 WL 43163 (E.D.N.Y. Jan. 7, 2025) (granting

11

Applicants' motions to dismiss with prejudice); *Przewozman v. Qatar Charity*, 2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) (granting Applicants' motions to dismiss, later with prejudice); *Henkin v. Qatar Charity*, 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023) (granting QNB's motion to dismiss without prejudice, with QC to renew its motion to dismiss shortly following the end of unfruitful jurisdictional discovery).[2]

These dismissals put the lie to Perles's suggestion that these cases—where Perles appears on each complaint as an author—somehow prove that Applicants are connected to terrorism. *See* Br. 11, 45 (citing same set of cases).

**C.    Applicants Are Wrongfully Accused in the U.S. District Court for the Southern District of Florida of Supporting the Murder of Steven Sotloff.**

On May 13, 2022, Perles, representing the estate and family members of deceased American journalist Steven Sotloff, filed yet another baseless complaint against Applicants, asserting primary and secondary liability claims under the federal Anti-Terrorism Act in the

---

[2] While there was a notice of appeal to the Second Circuit in *Force*, that appeal was voluntarily dismissed under Fed. R. App. P. 42(b). *Force, et al. v. Qatar Charity, et al.*, No. 25-276 (2d Cir. Mar. 20, 2025), ECF No. 26. The orders referenced above in *Przewozman* and *Henkin* were never appealed.

U.S. District Court for the Southern District of Florida in the Sotloff Action.  JA4-5 ¶ 7; JA40-107.  The plaintiffs claimed that Applicants facilitated a $800,000 wire transfer to an individual who later joined ISIS and ordered the execution of Steven Sotloff.  JA5 ¶ 11; JA41 ¶ 3; JA65 ¶¶ 106-109.

The *sine qua non* of the plaintiffs' allegations was the alleged $800,000 wire transfer, which Perles claimed was proven by a single, one-page "wire-confirmation printout" allegedly created by a bank in Istanbul, Turkey—Ziraat Bank—and written in Turkish.  This printout purportedly reflected the alleged $800,000 wire transfer being made on October 16, 2013, sent by an individual named "Jassem Abdullah" (allegedly acting for QC) from an account at QNB to an account at Ziraat Bank in Turkey in the beneficiary name "Fadhel al Salim."  JA5 ¶ 11; JA41 ¶ 3; JA65 ¶¶ 106-109.  The complaint alleged that al Salim picked up these funds from a branch of Ziraat Bank in Istanbul, signing his name and writing other information on the printout as proof of his receipt of the funds.  JA5 ¶ 12; JA65 ¶¶ 106-109.  This purported bank record (the "Purported Transfer Record," and later the "Forged Record" after indicia of fraud were identified) was referenced repeatedly in the

13

complaint.  JA41 ¶ 3; JA50 ¶ 39; JA65 ¶¶ 106-109; JA88 ¶ 226.  After

crossing the border into Syria, al Salim allegedly proceeded to use these

funds to raise a brigade of terrorist fighters in Syria and, less than a year

after the alleged wire transfer, allegedly ordered the execution of Steven

Sotloff.  JA5 ¶ 13; JA41 ¶ 3; JA66 ¶ 112.

On May 30, 2023, invoking and relying upon the Purported

Transfer Record—the only alleged documentary "evidence" supporting

the plaintiffs' claims and thus the critical linchpin of the plaintiffs'

allegations against Applicants—Judge Middlebrooks denied Applicants'

motions to dismiss.  JA5 ¶ 10; JA269-331.

### D. Applicants Identify Multiple Indicia of Forgery on the Face of the Purported Transfer Record.

Following denial of their motions to dismiss, Applicants asked the

court to order production of the Purported Transfer Record, which Perles

had yet to produce.  JA6 ¶ 14.  Applicants explained that, despite diligent

and comprehensive searches of their own databases and records,

Applicants found no record of the alleged wire transfer.  *Id.* ¶ 15; JA553.

On June 8, 2023, the court ordered the plaintiffs to produce the

Purported Transfer Record within three days of entry of a confidentiality

order (the "Confidentiality Order"), and the plaintiffs ultimately did so on

14

June 26, 2023. JA6 ¶ 16; JA333; JA553. The Confidentiality Order made clear that it "does not confer blanket protections on all disclosures or responses to discovery," but instead "extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." JA403 § 1. Further, Section 8 of the Confidentiality Order, titled "Protected Material Subpoenaed or Ordered Produced in Other Litigation," expressly contemplated that information designated Attorneys' Eyes Only in the Sotloff Action might also be subpoenaed and required to be produced in another proceeding. JA414 § 8.

The plaintiffs initially designated the entirety of the Purported Transfer Record "Attorneys' Eyes Only," thereby preventing Applicants' counsel from sharing the document with their clients. After Applicants' counsel demanded that they be able to provide at least portions of the Purported Transfer Record to their clients to allow for verification (or not) of some of the information contained therein, Perles produced a redacted version, which it designated as "Confidential."[3]

---

[3] The plaintiffs subsequently agreed to remove the "Confidential" designation of this version of the document following Applicants' demonstration that the document was forged. JA6 ¶ 17 n.2; JA553 & n.1.

Following receipt of the document, Applicants identified various indicia of forgery on the face of the document, including numerous misspellings of key banking terms, blank spaces where required information should have been included, and reference to a SWIFT Business Identifier Code[4] for QNB that did not even exist in 2013 when the alleged transfer occurred and that SWIFT did not assign to QNB until October 25, 2017—more than four years after the alleged wire transfer to al Salim. JA6 ¶ 17; JA553. Moreover, QNB contacted Ziraat Bank, which supposedly had received the wire reflected in the Purported Transfer Record, and Ziraat Bank confirmed that it likewise was unable to identify any record of the alleged transfer. JA7 ¶ 18; JA553. By way of a letter dated August 17, 2023, counsel for Applicants promptly brought these and other indicia of forgery in the transfer record (hereinafter, the "Forged Record") to the attention of Perles. JA7 ¶ 19.

---

[4] SWIFT, which is the acronym for the Society for Worldwide Interbank Financial Telecommunication, is a network that banks use for execution of financial transactions and transfer of funds between accounts worldwide. To avoid confusion in the sending and receipt of global interbank wire transfers, SWIFT assigns a unique Business Identifier Code to each bank that participates in its network. JA6 ¶ 17 n.1.

### E.    Perles Acknowledges That It Cannot Authenticate the Forged Record and Agrees to Move Jointly to Dismiss the Sotloff Action with Prejudice.

Following receipt of Applicants' August 17, 2023 letter, Perles reportedly conducted its own investigation into the authenticity of the Forged Record.  JA7 ¶ 20; JA553.  Approximately one month later, Perles acknowledged that, despite speaking with at least one individual located in Paris, France, who allegedly witnessed the transaction and who continued to maintain that the Forged Record was genuine (the "Anonymous Source"), Perles could not explain the indicia of forgery nor independently verify the legitimacy of the record.  JA7 ¶¶ 21-23; JA553-54.  Given that the plaintiffs' claims and their invocation of personal jurisdiction over Applicants both concededly hinged on the ability to authenticate the Forged Record as proof of the alleged $800,000 wire transfer—something that Perles could not do—the plaintiffs agreed to move jointly with Applicants to dismiss the Sotloff Action with prejudice and to vacate Judge Middlebrooks's earlier denial of Applicants' motions to dismiss.  JA7-8 ¶ 24; JA554.  The parties filed their joint motion on September 22, 2023.  JA339-369.

17

A week later, on September 29, 2023, Judge Middlebrooks found "good cause to grant" the parties' joint motion.  JA8 ¶ 25; JA371-72. Accordingly, Judge Middlebrooks ordered that the Sotloff Action be dismissed with prejudice and that the court's earlier opinion and order denying Applicants' motions to dismiss be vacated.  *Id*.

## F.    Applicants Take Concrete Steps Toward Initiating Foreign Proceedings.

The Forged Record has caused, and continues to cause, substantial reputational harm to Applicants.  This document served as the basis for the publicly filed Sotloff Action, a lawsuit that caused Applicants to incur substantial legal expenses and erroneously portrayed Applicants as supporting a notorious terrorist group responsible for the gruesome death of an American citizen.  JA8 ¶¶ 26-27.  Applicants' injuries were further exacerbated by the international media's widespread reporting of that litigation and the baseless claims against Applicants, which continued notwithstanding the subsequent dismissal with prejudice.  JA8-9 ¶¶ 29-31; JA374-76; JA378-80.  And even after filing the Application, damaging and inaccurate news reporting continued to be published, further harming Applicants.[5]

---

[5] For example, a March 15, 2024 article from *The Cradle* titled, "Doha

Applicants have taken concrete steps toward initiating civil and criminal actions in France against the Anonymous Source. JA9 ¶ 32. Given that the identities of the additional individuals who participated in forging and/or disseminating the Forged Record (together with the Anonymous Source, the "Forgers") are not yet known to them, Applicants cannot yet say with confidence where those persons reside. But Applicants have strong reason to believe that at least one of the relevant wrongdoers, the Anonymous Source, is located in France. *Id*. This belief is based upon affirmative representations by Perles to counsel for Applicants about interviewing fact witnesses to the Sotloff Action in Paris, France, in or around August 2023. In particular, Perles reported to Applicants' counsel that the Anonymous Source, based in Paris, claimed to have witnessed the non-existent $800,000 transaction and

---

Hunts for Whistleblowers Who Revealed Qatar's Funding of ISIS," accompanied by a highly incendiary still image of what appears to be an ISIS beheading video, makes no mention of the forgery or the related dismissal of the Sotloff Action. The article accuses Applicants of hunting "whistleblowers" (rather than perpetrators of an audacious fraud on them, the Sotloffs, and the U.S. courts) "who provided bank records linking Doha to the murder" of Sotloff, as if those bank records were genuine documents, rather than the forgeries they have been proven to be. *Doha Hunts for Whistleblowers Who Revealed Qatar's Funding of ISIS*, The Cradle (Mar. 15, 2024), https://thecradle.co/articles-id/23907.

maintained that the Forged Record is authentic, despite the incontrovertible evidence to the contrary.  JA7 ¶¶ 21-22.

In France, Applicants plan on bringing against the Anonymous Source, at a minimum, a tort claim based on wrongdoing (*faute*) under Article 1240 of the French Civil Code and a criminal claim of forgery and use of forgery (*faux et usage de faux*) under Article 441-1 of the French Criminal Code as criminal complainants.  JA9 ¶ 34.  QNB retained the French law firm Navacelle to conduct legal analyses in preparation for such proceedings, which analyses have informed the claims Applicants plan to bring.  *Id.* ¶ 33; *see also* JA381-91 (Declaration of Stéphane de Navacelle).  If the discovery obtained from the Application indicates that additional foreign jurisdictions are appropriate, Applicants will obtain local counsel there and pursue similar claims.  JA10 ¶ 36.

## G.  Perles Has in Its Possession, Custody, and Control Information Sufficient to Identify the Forgers

Perles has expressly acknowledged that it knows the identity of the Anonymous Source—an individual Perles has described to Applicants' counsel as someone (i) based in Paris, France, with whom the firm has spoken; (ii) who has claimed to Perles that he witnessed the alleged $800,000 transaction; and (iii) who has claimed to Perles that the Forged

Record is genuine.  JA7 ¶¶ 21-22 & n.3.  In other words, Perles has in its possession, custody, and control information that will enable Applicants to identify the Anonymous Source who provided Perles with false information about Applicants, including information about the Forged Record, as well as potentially other Forgers, all of which is critical for initiating foreign proceedings.  JA10 ¶ 38.

Without such information from Perles, which Applicants are unable otherwise to obtain, there will be no way for Applicants to seek legal redress against the individuals who, by their fraudulent scheme, caused Applicants to incur substantial legal fees in defending the frivolous Sotloff Action and wrongly and tortiously tarnished Applicants' reputations.  JA10 ¶ 39.

## H.   The District Court Grants the Application Under 28 U.S.C. § 1782.

Given Perles's steadfast refusal to share any aspect of the information requested, Applicants were left with no option but to seek assistance from the United States courts.  On March 12, 2024, Applicants filed with the U.S. District Court for the District of Columbia an *ex parte* application for an order to conduct discovery for use in foreign proceedings pursuant to 28 U.S.C. § 1782 (the "Application"), JA1-2, with

21

an accompanying memorandum of law, Dkt. 1 (publicly available at Dkt. 2), as well as proposed subpoenas, JA16-38. The proposed subpoenas contain just two document requests and seek just a single deposition under Federal Rule of Civil Procedure 30(b)(6), on only six deposition topics. JA22-23, 33-34. In addition to various exhibits, JA13-380, the Application further attaches declarations from counsel for Applicants and from local French counsel. JA3-12 (Declaration of Douglas Hallward-Driemeier); JA381-91 (Declaration of Stéphane de Navacelle); JA392-93 (Declaration of Kevin Walsh).

The district court provided Perles an opportunity to oppose the Application, JA395-96, and Applicants duly served the Application and its attachments (including the proposed subpoenas) on Perles per the court's order, JA397-98.

After full briefing, Judge Loren L. AliKhan granted the Application on February 10, 2025. First disposing of Perles's argument that issue preclusion barred the Application, Judge AliKhan rejected Perles's contention that "[t]he exact same issue [Applicants] raise before this Court—discovery regarding the identities of witnesses to or concerning the Transfer Record—was litigated and ruled on by Judge Middlebrooks."

JA555-56. Judge AliKhan held that the "two issues are not the same," noting that the issue before the district court in this matter was whether Applicants "may seek the production of facts related to the Transfer Record's creation," while the issue before Judge Middlebrooks was "who would be able to access materials designated as [Attorneys' Eyes Only]." JA556. The court further held that the issue could not have been "actually and necessarily determined" in the Sotloff Action because, "at the time that the confidentiality order was issued, [Applicants] had not yet had the opportunity to review and question the legitimacy of the Transfer Record or know that the Perles Firm would be unable to authenticate it." *Id.*

Turning to the Section 1782 statutory requirements, the district court noted that Perles contested only the second statutory requirement, that the discovery sought be "for use in a proceeding before a foreign or international tribunal." JA557. After noting that "a proceeding need not be 'pending' or 'imminent,' but only 'within reasonable contemplation,'" and that an applicant's burden is *de minimis*, the district court found that Applicants had met their burden and, contrary to Perles's assertions, had

met the requirements of the "who," "what," "where," and "when" that Perles claimed was required.  JA557-58.

Turning next to the *Intel* discretionary factors, the district court found for Applicants on all four factors.  Namely, the district court found that: (1) there was no indication that Perles (nor the Sotloffs for that matter) would be a participant in the foreign proceeding; (2) there was no authoritative proof (or any proof at all) from Perles that France would not be receptive to evidence obtained under Section 1782; (3) there was no indication that Applicants were attempting to circumvent any foreign proof-gathering restrictions or other policies (rejecting a hodgepodge of arguments advanced by Perles under this factor); and (4) that Applicants' "two requests for documents and six deposition topics in order to ascertain the identities of the Forgers" were neither unduly intrusive nor burdensome (with even Perles conceding that the requests were "narrowly targeted").  JA558-63.

The district court issued an order granting the Application, authorizing Applicants to re-serve the subpoenas on Perles, and directing Perles to respond to the subpoenas.  JA564-65.  After Applicants properly re-served their subpoenas on Perles, Perles, through its attorneys,

notified Applicants of its intent to appeal Judge AliKhan's order to this Court and requested a stay of discovery. Applicants consented to a stay on the condition that a relatively expedited briefing schedule would be requested, which schedule was subsequently entered by this Court. Perles timely appealed.

## SUMMARY OF THE ARGUMENT

I. Perles's lead argument—that the Confidentiality Order bars disclosure of the information requested in the Application—is based on the flawed premise that unilateral redaction of a *document* like the Forged Record in one proceeding (based, in this case, on misrepresentations about the document's authenticity) somehow immunizes *all facts* about the document, such as the circumstances of the document's forgery, from discovery in any court or jurisdiction in perpetuity. There is no case that supports that astounding proposition; in fact, the case law is to the contrary.

Moreover, Perles's reliance on issue preclusion is misplaced, given that Perles is unable to satisfy its burden to establish the three conditions necessary for issue preclusion: (1) the issues with respect to the litigation of the Confidentiality Order and of the Application were hardly

"identical," and the facts pertinent to each litigation meaningfully differed; (2) the issue could not have been "actually and necessarily determined" in the earlier case because the information sought in the Application could not have been submitted to Judge Middlebrooks at the time of the Confidentiality Order, as neither the court nor the parties had yet learned that the record was forged; and (3) preclusion would work a "basic unfairness" to Applicants, because they clearly lacked any incentive before they knew of the forgery to litigate the point in the Sotloff Action, while the stakes with respect to the Application were of a far greater magnitude after the fraud became clear.

II. The district court also properly found that the discovery requested by the Application was "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). This is a *de minimis* burden; the Supreme Court has explained that "the 'proceeding' for which discovery is sought under § 1782(a) must be in *reasonable contemplation*, but *need not be 'pending' or 'imminent.'" Intel*, 542 U.S. at 247 (emphases added). Applicants have amply satisfied that requirement, as demonstrated by their declarations explaining that they intend to bring suit *at least* in France (and potentially additional jurisdictions) as well as

26

the specific legal theories under which they intend to bring suit, which have been developed through legal analyses conducted by local French counsel that QNB engaged. Perles's arguments to the contrary impose various additional requirements that are not reflected in the law and that are based on mischaracterizations of Applicants' positions and of the record.

III. As to the *Intel* discretionary factors, the district court's well-reasoned analyses of these factors are reviewed under a deferential abuse-of-discretion standard. Here, the district court found for Applicants on all factors, and Perles raises no basis for this Court to find an abuse of the district court's considerable discretion. *First*, neither Perles (nor the Sotloffs for that matter) will be a party to the contemplated foreign proceedings. *Second*, there is no reason to believe that a foreign court will not be receptive to the evidence obtained under Section 1782 discovery; France and its courts are receptive to the introduction of evidence obtained pursuant to Section 1782. *Third*, there is no indication that Applicants are attempting to circumvent any foreign proof-gathering restrictions or other policies. And *fourth*, the discovery requests that Applicants advance here are narrowly tailored—focusing

27

precisely on the source of the Forged Record—such that the requests are neither unduly intrusive nor burdensome.  Perles offers no reasoned basis to reach any contrary result, as the district court's analysis was well within its considerable discretion.

## STANDARD OF REVIEW

A district court's determination of issue preclusion is reviewed *de novo*.  *Aenergy, S.A. v. Republic of Angola*, 123 F.4th 1351, 1356 (D.C. Cir. 2024).  "On *de novo* review, [the Court] generally may affirm on any ground supported by the record."  *Meza v. Renaud*, 9 F.4th 930, 933 (2021).

Regarding Section 1782's statutory requirements, numerous federal courts of appeals have applied an abuse-of-discretion standard to the analysis of the statutory requirements, including the "for use" requirement,[6] which is essentially factual in nature, though this Court

---

[6] *See In re Porsche Automobil Holding SE*, 985 F.3d 115, 120 (1st Cir. 2021) ("The district court did not abuse its discretion in finding that Porsche met the statutory requirements of section 1782(a)."); *In re Banco Mercantil Del Norte, S.A.*, 126 F.4th 926, 931 (4th Cir. 2025) ("The district court thus did not abuse its discretion in finding that the Application satisfied § 1782's 'for use' requirement."); *Pons v. AMKE Registered Agents, LLC*, 835 F. App'x 465, 470 (11th Cir. 2020) ("The district court did not abuse its discretion in finding that the 'for use' requirement was satisfied.").  Perles notes a similar line of cases in its brief.  Br. 16 n.2.

does not appear to have directly opined on this issue.  The standard of review is not determinative, however, because even if the Section 1782 statutory requirements were to be reviewed *de novo*, as Perles contends, s*ee* Br. 16, the "for use" requirement imposes only a *de minimis* burden on applicants, *see In re Veiga*, 746 F. Supp. 2d 8, 18 (D.D.C. 2010).  Even under *de novo* review, that burden is easily satisfied by the record below. *See Meza*, 9 F.4th at 933.

As to the *Intel* discretionary factors under Section 1782, as Perles concedes, *see* Br. 16, a district court has "considerable discretion when determining whether to grant discovery under § 1782(a)," and its decision will be reviewed for an abuse of discretion.  *Lazaridis v. Int'l Ctr. for Missing & Exploited Children*, 473 F. App'x 2, 3-4 (D.C. Cir. 2012).  This standard of review is "extremely limited and highly deferential."  *In re Bracha Found.*, 663 F. App'x 755, 757 (11th Cir. 2016) (citation omitted) (noting that an abuse-of-discretion standard applies in the Section 1782 context "[b]ecause Congress has given the district courts such broad discretion in granting judicial assistance to foreign countries" under that statute).

29

# ARGUMENT

## I.    Perles's Lead Argument Regarding the Confidentiality Order Is a Red Herring, and the District Court Properly Rejected It.

### A.    The Confidentiality Order Did Not Somehow Immunize from Future Discovery Underlying Facts Surrounding the Forged Record.

Perles's lead argument—that the Confidentiality Order bars disclosure of the information requested in the Application—is based on the flawed premise that unilateral redaction of a *document* like the Forged Record in one proceeding (based, in this case, on inaccurate representations about the document's authenticity) somehow immunizes *all facts* about the document, such as the circumstances of the document's forgery, from discovery in any court or jurisdiction in perpetuity.  Not surprisingly, Perles provides no authority for that astonishing assertion, and there is none.

Indeed, the terms of the Confidentiality Order, conveniently ignored by Perles, contradict Perles's position.  The Confidentiality Order made clear that it "does not confer blanket protections on all disclosures or responses to discovery," but instead "extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles."  JA403 § 1.  Moreover, Section 8 of the

30

Confidentiality Order, titled "Protected Material Subpoenaed or Ordered Produced in Other Litigation," expressly contemplated that information designated Attorneys' Eyes Only in the Sotloff Action might also be subpoenaed and required to be produced in another proceeding. JA414 § 8.[7] Pursuant to that section, it is Perles's responsibility to seek a subsequent protective order and then for "*the court from which the subpoena or order issued*"—*i.e.*, D.D.C. here—to make a determination regarding such an order. *Id.* (emphasis added).

Case law also contradicts Perles's position. "[I]t is difficult to see how the defendants can reasonably argue that they produced documents in reliance on the fact that the documents would always be kept secret" where "the confidentiality order specifically contemplates that relief from

---

[7] Contrary to Perles's assertions on appeal, that section does not solely apply to "a subpoena from a *non-party* to the protective order," Br. 23, but broadly references "a subpoena or a court order issued in other litigation." Nor is Applicants' interpretation of that section "nonsensical," as Perles contends; counsel often change for parties, particularly across litigations, and therefore a provision for notification of the Confidentiality Order is sensible. In any event, Applicants' broader points, which Perles entirely misses, are that the Confidentiality Order does not provide any blanket guarantee that the material covered by the order would not be produced in another litigation and that the underlying information Applicants seek is not the subject of the Confidentiality Order anyway.

the provisions of the order may be sought." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006); *see also Carter-Wallace, Inc. v. Hartz Mountain Indus.*, 92 F.R.D. 67, 69 (S.D.N.Y. 1981) (rejecting "the absurd tenet that a party can avoid discovery in one case merely because it disclosed the same material to an adversary bound by a protective order in another case").

And there is a further distinction here: while Perles contends that "the Application here demands the exact same information previously denied to them by the Confidentiality Order," Br. 19, Applicants are *not* seeking discovery of any information that Perles unilaterally redacted from the Forged Record, which was based on the representation—since proven wrong—that the information was authentic. In other words, Applicants are not seeking any information about the made-up scribblings on a forged record that supposedly represents the "witnesses" to a non-existent transaction. Nor do Applicants seek an unredacted version of the Forged Record; they instead seek information about the *real* individuals who participated in, or were responsible for, fabricating

and disseminating the Forged Record as part of a defamatory and fraudulent scheme.[8]

Perles's reliance on comments in Judge Middlebrooks' separate order entering the Confidentiality Order (the "Entry Order") regarding potential security concerns for those putative "witnesses" is even more off-base. *See* Br. 18-19 (quoting JA423). Perles fails to mention that Judge Middlebrooks entirely premised that portion of his discussion on the court's *earlier* order denying Applicants' motions to dismiss, which was *based on* the mistaken assumption that the Forged Record was authentic. *See* JA423-24. However, that order was *ultimately vacated in*

---

[8] Perles coyly hints, without actually admitting, that there may be some overlap between (1) the identities of those with knowledge of the Forged Record, which information Applicants seek for use in a foreign proceeding, and (2) the names of purported "witnesses" identified in the Forged Record. *See, e.g.*, Br. 13 ("*To the extent* that one or more of the individuals identified on the unredacted Transfer Record is the Anonymous Source . . . ." (emphasis added)). But even if that were so, this would simply be a coincidence, however clumsy, in the execution of the fraud. Applicants seek discovery only of the *actual* persons responsible for the document, regardless of any overlap with the redacted fictional information. Moreover, Applicants' discovery requests are based entirely on the non-confidential version of the Forged Record that Perles agreed to file on the public docket, which is the version of the document that betrayed its fraudulent nature by its numerous errors and inconsistencies. The Application is therefore entirely independent of any information that may remain under confidentiality protection and would be the same even if no such information existed.

*response to incontrovertible evidence that the document was forged,*
JA371-72.   Perles also conveniently ignores Judge Middlebrooks's
subsequent language in the Entry Order that "*[w]ithout knowing more*
about a particular document or set of documents, it is *nearly impossible
to properly weigh the security concerns* at issue."   JA424 (emphases
added).    Applicants'   subsequent   identification   of   numerous,
incontrovertible indicia of fraud in the Forged Record plainly constitutes
"knowing more," which convinced Judge Middlebrooks to dismiss the
action with prejudice.[9]  In other words, the Confidentiality Order, and
Judge Middlebrooks's comments when entering it, took place at a time
when the Court was operating under the mistaken assumption that the
Forged Record—like any document brought before a court—was not a
forgery, but a genuine record documenting an actual banking transaction.
When Judge Middlebrooks subsequently learned the truth, he took
prompt remedial action, vacating his earlier order and dismissing the

---

[9] Indeed, precisely because of the irrefutable evidence that the document
was a forgery, Perles ultimately agreed that the document—which Perles
initially tried to withhold from Applicants and produced only after being
so ordered by the court—should be *publicly filed*, with limited redactions,
as an exhibit to the Sotloff parties' joint motion to dismiss the Sotloff
Action with prejudice.  JA357-59.

action with prejudice.    Accordingly, Perles's continued reliance on statements by Judge Middlebrooks when he was laboring under the false impression that the Forged Record was authentic is misplaced.

### B.     Issue Preclusion Does Not Apply Here.

"Issue preclusion bars successive litigation of 'an issue of fact or law' that 'is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment.'" *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (alteration in original) (quoting Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982)).   In order for issue preclusion to apply, *all* of the following conditions must be met: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination."   *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n,* 439 F.3d 740, 743 (D.C. Cir. 2006) (quoting *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)).   "As the party invoking collateral estoppel," Perles "bears the burden of establishing that the

35

conditions for its application have been satisfied." *Id.* Yet, even a cursory analysis of these conditions confirms that Perles meets *none* of them. Accordingly, the district court rightly determined that issue preclusion does not apply here.

*First*, the district court properly rejected Perles's contention that "[t]he exact same issue [Applicants] raise before this Court—discovery regarding the identities of witnesses to or concerning the Transfer Record—was litigated and ruled on by Judge Middlebrooks." JA555-56. In so doing, Judge AliKhan correctly found that the "two issues are not the same," noting that the issue before her was whether Applicants "may seek the production of facts related to the Transfer Record's creation," while the issue before Judge Middlebrooks was "who would be able to access materials designated as [Attorneys' Eyes Only]." JA556; *see also* JA422-23 (Entry Order noting, "The Parties agree that a confidentiality order is necessary and agree on virtually all terms," but for "one disagreement" about the Attorneys' Eyes Only provision: "As is relevant here, Plaintiffs wish to limit such disclosures to Defendants' outside counsel and other approved persons . . . Defendants' counsel, on the other

hand, contend that 1-3 people from their clients . . . need to have access . . . for them to mount a proper defense.").

"The basic rule, that issue preclusion applies only if the issue in the prior litigation is *identical* to the issue in the subsequent litigation, entails the corollary that a *difference in pertinent facts, sufficient to substantially change the issue, renders the doctrine of issue preclusion inapplicable*." 18 James W. Moore et al., Moore's Federal Practice § 132.02[2][3], at 27-29 (3d ed. 2008) (emphases added). Perles cannot meet its burden of demonstrating that the issues are "*identical*"; moreover, the facts pertinent to the litigation of the Application differ in a critical way: by that time, Applicants were aware that the Purported Transfer Record was a *forgery*, something they did not know and could not have known at the time they were litigating the motion for a confidentiality order in the Sotloff Action. The Application is therefore markedly distinct and does not represent "another bite at the apple," Br. 2, no matter how much Perles wordsmiths the two sets of issues in attempt to make them appear "identical."

*Second*, the district court properly found that the issue could not have been "actually and necessarily determined" in the Sotloff Action

because "at the time that the confidentiality order was issued, [Applicants] had not yet had the opportunity to review and question the legitimacy of the Transfer Record or know that the Perles Firm would be unable to authenticate it." JA556. Judge Middlebrooks did not actually and necessarily determine the issue now raised in the Application, which seeks *underlying facts* about the creation and dissemination of the Forged Record, not the identities of the purported "witnesses" to a non-existent transaction. Perles therefore cannot meet its burden to demonstrate that there is no "uncertain[ty] whether the issue was actually and necessarily decided in that [first] litigation." *Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684-85 (D.C. Cir. 1992) (reversing determination of issue preclusion in light of "lingering uncertainty"). The information sought in the Application and the issues before this Court could never, of course, have been submitted to Judge Middlebrooks at the time of the Confidentiality Order, because neither the court nor the parties had yet learned that the record was forged. *See Sorenson Commc'ns, Inc. v. FCC,* 765 F.3d 37, 44 (D.C. Cir. 2014) (issue preclusion does not apply "where the situation is vitally altered between the time of

the first judgment and the second" (quoting *Comm'r v. Sunnen,* 333 U.S. 591, 599-600 (1948))).

*Third*, preclusion would work a "basic unfairness" to Applicants, because they "clearly lacked any incentive to litigate the point in the first [action], but the stakes of the second [action] are of a vastly greater magnitude." *Yamaha Corp. of Am.* 961 F.2d 245 at 254. At the time of litigating the motion for a confidentiality order, Applicants did not have any reason to know that the Application would be necessary: Perles had yet to produce the Forged Record to Applicants, meaning that they did not yet have the opportunity to examine the Forged Record and determine that it was replete with indicia of inauthenticity. Without this key information, including the Forged Record itself, Applicants lacked a full and fair opportunity to litigate the present central issue: the identities of those with knowledge of the record's forgery. *See Brodie v. Jackson*, 2014 WL 11813594, at *4 (D.D.C. July 7, 2014), *aff'd*, 630 F. App'x 1 (D.C. Cir. 2015*)* (finding plaintiff was not collaterally estopped from litigating claims because he "lacked incentive to litigate the issues . . . in the prior proceeding, as he was unaware of" certain key information at the time of his initial suit). Indeed, at that earlier time, Judge

Middlebrooks pointed out that Applicants "agree that a confidentiality order is necessary and agree on virtually all terms," before flagging the lone dispute regarding the scope of the "Attorneys' Eyes Only" designation.  JA422.  As the district court properly held, Perles cannot satisfy its burden of demonstrating the conditions required for issue preclusion, despite Perles's attempts to shoehorn the distinct sets of facts into this framework.

## II.    The District Court Properly Found That Applicants Satisfy the Statutory Requirements of 28 U.S.C. § 1782.

As an initial matter, Perles does not dispute that Applicants satisfy the first and third statutory requirements under 28 U.S.C. § 1782.  Perles therefore concedes that Perles "resides or is found" within the district (the District of Columbia) and that Applicants are "interested person[s]" within the meaning of the statute.  28 U.S.C. § 1782(a).

Contesting just the second factor—that the discovery be "for use in a proceeding in a foreign or international tribunal," 28 U.S.C. § 1782(a)— Perles ignores clear guidance from the Supreme Court regarding this factor, which requires only a *de minimis* showing.  Applicants more than made such a showing.  As the district court properly found, contrary to Perles's continued characterization of the Application on appeal as a

40

"bona fide fishing expedition," Br. 26, the "Application is . . . a far cry from the 'fishing expedition' the Perles Firm asserts it to be, and it is instead well within the confines of Section 1782(a)."  JA558.

The Supreme Court has explained that "the 'proceeding' for which discovery is sought under § 1782(a) must be in *reasonable contemplation*, but *need not be 'pending' or 'imminent.'" Intel*, 542 U.S. at 247 (emphases added).  "Section 1782's 'for use' requirement is not an exacting one," *In re Hulley Enters. Ltd.*, 2017 WL 3708028, at *4 (D.D.C. Aug. 18, 2017), and "the burden imposed upon an applicant is *de minimis*," *Veiga*, 746 F. Supp. 2d at 18.

Applicants satisfy this *de minimis* burden:  they have explained that they have taken steps toward initiating proceedings in France against the Anonymous Source (and potentially others) to bring a tort claim based on wrongdoing (*faute*) under Article 1240 of the French Civil Code and a criminal claim of forgery and use of forgery (*faux et usage de faux*) under Article 441-1 of the French Criminal Code as criminal complainants.  JA9 ¶ 34.  QNB has retained the French law firm Navacelle to conduct legal analyses in preparation for these proceedings, which analyses have informed the claims Applicants plan to bring.  *Id.* ¶

41

33.  Applicants further attached to the Application a detailed declaration from Navacelle's founder and managing partner setting forth the bases for Applicants' claims in France.  JA381-91.  Applicants are prepared to bring these proceedings "immediately" upon receipt of the necessary information sought in the Application.  JA558 (quoting Dkt. 15 at 14).  If the discovery obtained from the Application indicates that additional foreign jurisdictions are appropriate (for further proceedings against the Forgers), Applicants will obtain local counsel there and pursue similar claims.  JA10 ¶ 36.

Perles ignores all of the above and badly mischaracterizes the record in arguing on appeal that "the Application reveals nothing more than an intention to file some type of suit, at some undefined point in time, in some undetermined jurisdiction, against some unnamed individual(s)," and that Applicants "acknowledge that their Application lacks essential information regarding the 'who,' 'where,' 'what,' and 'when' of this hypothetical foreign proceeding."  Br. 24-25.  But Applicants have acknowledged no such thing, and Perles advances arguments that are deficient both as a matter of law and fact.

42

Regarding Perles's unsupported demands for more granular information regarding the "who," "where," "what," and "when" of the foreign proceeding, the district court properly addressed and dispensed with those demands.

As to the 'who,' "Section 1782(a) permits identity-confirming discovery" like that Applicants seek here. *In re C5 Cap. Ltd.*, 2024 WL 1701650, at *2 (D.D.C. Apr. 18, 2024) (in context of application compelling discovery from law firm); *see also In re Pishevar*, 2023 WL 2072454, at *2 (D.D.C. Feb. 17, 2023) ("The information and documents sought from [the respondent] are also 'for use' in these contemplated proceedings because the identity of the UK Source is instrumental to pursuing [the applicant's] claims.").

Moreover, Perles's suggestion that Applicants "fail[] to provide *any* identifying information about their putative defendant" is flatly wrong. Perles tries to distinguish *Pishevar*—a case that shares many parallels with this case—by arguing (in a footnote) that the applicant there had provided more information about the litigation target, namely that the target was a "male lawyer based in the UK." Br. 26 n.4 (quoting *Pishevar*, 2023 WL 2072454, at *1). But there is little difference between those

circumstances and the present situation, where Applicants have asserted (based on representations from Perles) that the Anonymous Source is (1) an individual based in Paris, France, (2) who allegedly witnessed the transaction at issue, (3) who continued to maintain that the Forged Record is genuine, and (4) who met with Perles on at least one occasion in Paris.  To the extent discovery reveals there are additional Forgers working in concert with the Anonymous Source, Applicants have already sufficiently articulated the "who" for the purposes of Section 1782 with respect to the Anonymous Source.  Perles's astounding claim that, unlike in *Pishevar*, "there is a legitimate question whether the [Applicants] were even the victims of an illicit act perpetrated by a foreign criminal/tortfeasor," Br. 26 n.4, ignores the reality that this case revolves around a brazen and defamatory forgery attempting to falsely link Applicants to the murder of an American citizen by ISIS, a notorious terrorist organization.

With respect to "where," the record is clear that Applicants have identified at least France as a jurisdiction, given the details Perles earlier shared and has repeated regarding the Anonymous Source.  Applicants need not have "independent evidence" of the same, as Perles contends

44

without citation to any legal authority. Br. 27. In any event, Perles cannot seriously contend that its own affirmative statements in litigation about the Anonymous Source, upon which Applicants based their Application, are not reliable. This Court should also reject Perles's attempts to characterize Applicants' identification of France as merely "'cursory' references to potential forums." Br. 28 (citation omitted). Applicants are seeking discovery for a French proceeding, and that has been the primary focus of their Application, including their analysis of the statutory requirements and discretionary factors. Should the requested discovery yield additional facts about additional potential jurisdictions, Applicants have been transparent that they reserve the right to bring claims in those jurisdictions as well. Given Perles's complete intransigence and stonewalling with respect to the sharing of any information concerning the Forged Record, Applicants are in such a position through no fault of their own. Nothing about those additional jurisdictions would, in any event, affect the central ask of the Application.

As to the "what," Applicants amply explained, supported by a detailed declaration from their local French counsel (which Perles barely mentions), the classes of claims they would bring, namely a tort claim

based on wrongdoing (*faute*) under Article 1240 of the French Civil Code and a criminal claim of forgery and use of forgery (*faux et usage de faux*) under Article 441-1 of the French Criminal Code as criminal complainants. Perles's attempt to pre-litigate these claims, *see* Br. 30-31, when it does not claim any expertise in French law and would not even be a party to the contemplated French proceeding, is unconvincing. And contrary to Perles's assertion on appeal that the Anonymous Source is "merely someone who allegedly witnessed an illicit transfer of money to a terrorist actor" and that thus there would be no basis for the contemplated claims, Br. 31, Applicants have asserted (based on Perles's earlier representations) that this individual *claimed to have witnessed an occurrence that there is no evidence ever occurred* and moreover, *continued to maintain to Perles directly that the Forged Record was genuine.* As French counsel Navacelle has confirmed, such actions give rise to liability under French law. JA385-88 ¶¶ 25-27.

Finally, as to the "when," the district court properly credited Applicants' assertion that they plan to bring suit "immediately" upon receipt of the necessary information, JA558 (quoting Dkt. 15 at 14), where the standard is not even "imminen[ce]" but only "reasonable

46

contemplation." *Intel*, 542 U.S. at 247. Perles argues that it was erroneous for the district court to give weight to the fact that QNB has retained counsel in France. Br. 33. But Applicants did far more than retain counsel in France. As Navacelle explained in a comprehensive declaration, he and his firm have been retained specifically to initiate the contemplated civil and criminal proceedings in France. JA385 ¶ 24. Moreover, he and his firm have conducted analyses, which are spelled out in greater detail in his declaration, regarding the specific causes of action Applicants intend to bring against the Forgers. JA385-88 ¶¶ 25-27 (laying out the details of those causes of action and their application to the facts). They also conducted a further analysis of the receptivity of French courts to evidence obtained under 28 U.S.C. § 1782. JA388-89 ¶¶ 32-37 (considering personal experience, a key civil ruling by the Tribunal de Paris, and the French Criminal Procedure Code). Finally, they analyzed the relevant limitations periods, JA389-90 ¶¶ 38-39, so that Applicants would understand their deadlines to file their claims, which would still be timely under that analysis for several more years.

Perles further complains in this section that Applicants "have done virtually no fact investigation," while conceding that they "did

investigate the inconsistencies found in the Transfer Record." Br. 34. Yet, not only does Perles have no basis upon which to make that statement, but Perles also fundamentally remains a gatekeeper with respect to the circumstances surrounding the Forged Record. Without critical information held by Perles and Perles alone, there is little Applicants could possibly learn from a further fact investigation of a *forgery*, the circumstances of which they know little. Applicants already confirmed, by reviewing their own records as well as by consulting Ziraat Bank, that they could not identify any other record of such a transfer. JA6 ¶ 15; JA7 ¶ 18. Moreover, as a district court analyzing a similar situation found, Applicants' efforts under Section 1782 have "been aimed at chasing down the same central piece of information needed to move forward with the foreign proceedings—the identity of the . . . Source." *Pishevar v. Fusion GPS*, 2025 WL 885115, at *10 (D.D.C. Mar. 21, 2025) (declining to hold against applicant that the contemplated foreign proceeding had "essentially been in a holding pattern," given that applicant needed the central piece of information and reconfirming that applicant had satisfied the "for use" requirement).

48

The district court therefore properly found that Applicants "satisfied each of Section 1782(a)'s requirements, giving [the] court the authority to grant the Application."  JA558.

## III. The District Court Did Not Abuse Its Considerable Discretion in Finding the *Intel* Discretionary Factors Weighed in Applicants' Favor.

As to the *Intel* discretionary factors under 28 U.S.C. § 1782, as Perles concedes, *see* Br. 16, a district court has "considerable discretion when determining whether to grant discovery under § 1782(a)," and its decision will be reviewed under an abuse-of-discretion standard. *Lazaridis,* 473 F. App'x at 3-4.  This standard of review for the discretionary factors is "extremely limited and highly deferential." *Bracha*, 663 F. App'x at 757 (citation omitted).  On appeal, Perles fails to show that the district court, in finding for Applicants on *all four factors*, abused its "considerable" discretion in ruling in their favor.

### A. Neither Perles Nor the Sotloffs Will Be Participants in the Foreign Proceedings.

First, the Supreme Court in *Intel* noted that, "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising

49

abroad." *Intel*, 542 U.S. at 264. The rationale behind this factor, the Supreme Court has explained, is that a "foreign tribunal has jurisdiction over those appearing before it [] and can itself order them to produce evidence." *Id.*

The crux of Applicants' contemplated claims is against the *Forgers*, not against Perles (nor the Sotloffs). Consistent with that reality, Applicants have already asserted in public court filings in the district court that neither Perles nor the Sotloffs will be participants in the contemplated foreign proceedings, *see* Dkt. 1 at 14-15 (opening brief); Dkt. 15 at 15-16 (reply brief), which the district court credited, *see* JA559. The need for Section 1782 aid is therefore relatively more apparent. No more is needed for this factor. *See In re Accent Delight Int'l*, 791 F. App'x 247, 251 (2d Cir. 2019) ("The first *Intel* factor requires only that a petitioner has sufficient need for § 1782 aid. If the target of the § 1782(a) application is [to be] a party to the foreign proceeding, that need is diminished." (citing *Intel*, 542 U.S. at 264)).

Perles's citation to the *Lazaridis* case for the proposition that "where no formal criminal proceedings had yet been filed . . . there was no certainty that the respondents would not ultimately be named as

defendants" is unavailing.  Br. 36 (citing *Lazaridis v. Int'l Ctr. for Missing & Exploited Children*, 760 F. Supp. 2d 109, 114 (D.D.C. 2011), *aff'd*, 473 F. App'x 2, 3-4 (D.C. Cir. 2012)).  *Lazaridis* is easily distinguishable: respondents in that case were "*necessarily participants* in the Greek prosecution because the lead defendant . . . [was] the president" of one of the respondents, obviating the need for Section 1782 discovery, *id.*; moreover, the court noted that the public prosecutor in Greece conducts the "preliminary inquiry of potential criminal activity," further obviating the need for Section 1782 intervention at that juncture, *id.*  In the present case however, as the Navacelle Declaration explains, "In France, criminal proceedings can be initiated by a private party filing a complaint with the public prosecutor."  JA385 ¶ 25 n.1.  Applicants therefore control whom they may reasonably name in such a criminal complaint (as well as, of course, in a civil complaint).   The district court did not abuse its discretion in finding that the first *Intel* factor weighed in favor of Applicants.

## B.    France and Its Courts Are Receptive to Evidence Obtained Under 28 U.S.C. § 1782.

The second *Intel* factor that "bear[s] consideration" is "the nature of the foreign tribunal, the character of the proceedings underway abroad,

and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. "Courts in the United States . . . presume that foreign tribunals will be receptive to evidence obtained here, and ordinarily consider 'only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782.'" *Pishevar*, 2023 WL 2072454, at *3 (quoting *In re DiGiulian*, 314 F. Supp. 3d 1, 8 (D.D.C. 2018)); *see also In re Esses,* 101 F.3d 873, 876 (2d Cir. 1996) (further explaining that the reason for considering only authoritative proof of rejection is to prevent "speculative forays into legal territories unfamiliar to federal judges" (citation omitted)).

The Application focuses on France, whose courts are receptive to discovery obtained under 28 U.S.C. § 1782. *See Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F. 3rd 1095, 1100-01 (2d Cir. 1995) ("[W]e are unable to accept the district court's conclusion that granting [the applicant's] discovery request [under 28 U.S.C. § 1782] will in fact offend the people of France."); *see also In re Rigby*, 2013 WL 622235, at *2-3 (S.D. Cal. Feb. 19, 2013) (concluding that "French courts would be receptive to the introduction of evidence obtained pursuant to § 1782").

52

Because France is patently receptive to discovery obtained under 28 U.S.C. § 1782, Perles avoids the actual issue and misleadingly argues that Applicants have failed to identify any forum in which they intend to bring suit with certainty.  Br. 38.

*First*, that is a mischaracterization of the record.  *See* Dkt. 1 at 2 ("QNB and QC's present understanding, based on previous communications with the Perles Firm, is that such litigation will be filed in the French courts."); Dkt. 15 at 16 ("[Applicants] have already stated that France is at least one relevant jurisdiction.").

*Second*, Perles presents no "authoritative proof" that France would reject Section 1782 discovery and instead launches into a reverie about how "[r]esidents of European Union member-states like France, after all, frequently travel around Europe for work and leisure" given "the European Union's open-borders policy," before pointing to an opinion suggesting that Germany and Ireland "disapproved of American-style discovery."  This Court need not credit this "speculative foray[]" from Perles, which falls far short of any "authoritative proof."  *Euromepa*, 51 F. 3rd at 1100-01.  Therefore, the presumption of receptivity to Section 1782 discovery still remains.  The district court did not abuse its

discretion in finding that the second *Intel* factor weighed in favor of Applicants.

### C. The Application Does Not Conceal an Attempt to Circumvent Proof-Gathering Restrictions.

Nor did the district court abuse its discretion in rejecting a hodgepodge of arguments from Perles under the third *Intel* discretionary factor; rather, the court properly held that the Application does not conceal an attempt to circumvent proof-gathering restrictions.

As in the analogous *Pishevar* case, this factor weighs in Applicants' favor because "[n]othing in the record indicates that [Applicants are] seeking discovery here via Section 1782 to circumvent the proof-gathering rules or policies of either this Court or the [foreign] courts." *Pishevar*, 2023 WL 2072454, at *4; *see also DiGiulian*, 314 F. Supp. 3d at 9 (same); *Veiga*, 746 F. Supp. 2d at 25 (same).  Counsel for QNB declared, under penalty of perjury, "Based on my personal knowledge and conversations of Ropes & Gray with Navacelle, I am not aware of any way in which the discovery requested from Respondent would circumvent foreign proof-gathering restrictions or other policies of the courts of France or the United States."  JA10-11 ¶ 41.  French counsel Navacelle

54

confirmed that understanding through a detailed explanation of the firm's analyses as well.  JA388-89 ¶¶ 32-37.

Perles, for its part, advances two primary arguments on appeal under the third *Intel* factor, focusing purely on policies of the United States: (i) the Application "is an attempt to side-step attorney work-product protection by requiring Perles to disclose—to their adversary— the names of *every* person whom the Firm spoke with as part of their investigation into the Transfer Record"; and (ii) the Application "presents a significant security risk to witnesses and those innocent people within Perles' network."  Neither argument holds water.

### 1.    The Requested Discovery Is Not Barred by the Attorney Work Product Doctrine.

*First*, Perles concedes that its attorney work product argument is a tortured one, acknowledging on appeal that "at first blush, it may seem odd that information about the identity of a witness could be considered work product."  Br. 43.  It is indeed odd—and at odds with the law.

In support of its argument that Applicants seek attorney work product, Perles cites language from the district court in *United States v. All Assets Held at Bank Julius Baer & Co.* that distinguishes between permissible discovery requests that "seek the identification of persons

55

with knowledge about the claims or defenses" and impermissible discovery that "seek[s] the identification of persons who have been contacted or interviewed by counsel concerning the case," and Perles contends that the Application falls into the latter impermissible category. Br. 42 (quoting 270 F. Supp. 3d 220, 225 (D.D.C. 2017)).

However, a more recent case, *Savignac v. Jones Day*, 586 F. Supp. 3d 16 (D.D.C. 2022), which Perles ineffectively attempts to distinguish, clarifies the contours of *All Assets Held*. In *Savignac*, Judge Moss explained that *All Assets Held* "concluded that the work-product privilege barred an interrogatory that sought the identities of *all persons 'who had been interviewed by Claimant, or from whom statements or documents had been obtained by Claimant, in relation to the facts and allegations of the Amended Complaint.'*" *Savignac*, 586 F. Supp. 3d at 19 (emphasis added) (quoting *All Assets Held*, 270 F. Supp. 3d at 222). Applicants' requested discovery is nowhere near that broad.

*Savignac* further explained that *All Assets Held* had noted the "general distinction between [1] requests for the *identities of individuals who have knowledge about the claims, defenses, or other relevant issues in a case*, on the one hand, and [2] requests for the *identities of*

56

*individuals whom opposing counsel has contacted or interviewed in preparation for litigation*, on the other." *Id.* at 20 (emphases added). Based on that distinction, *Savignac* ultimately found that a narrowly tailored request asking for the identities of individuals with whom a lawyer had "conferred or consulted" regarding a key issue, similar to what Applicants have requested with respect to the Forged Record, fell outside the scope of the attorney work-product doctrine and was therefore discoverable. *Id.* at 18.

Perles attempts to blur the distinction between overbroad discovery requests seeking comprehensive witness lists tied to the litigation, which under certain circumstances may be protected by the attorney work product doctrine, and narrower requests for the identities of witnesses who have knowledge of specific issues in the case, which are proper subjects of disclosure. As Judge AliKhan properly found, the Application falls squarely within that narrower category. JA562.

Applicants' two discovery requests seek limited information "sufficient to identify": (1) "the identity and location of the Anonymous Source"; and (2) "the identities of individuals with whom You or the Anonymous Source discussed the Purported Transfer Record." JA22-

57

23.[10]   In the discovery requests, the Anonymous Source is defined as the individual "who gave, sent, shared, or otherwise communicated a copy of the Purported . . . Transfer to You," JA21, while the Purported Transfer Record is defined and attached to the proposed subpoenas, *see* JA22; JA25-27.  These requests are therefore limited by and tethered to their specific relation to the Purported Transfer Record.  Under Judge Moss's analysis in *Savignac*, such requests are plainly permissible as they are "limit[ed] . . . to witnesses who may possess factual information relevant to the [Purported Transfer Record]."  *Savignac*, 586 F. Supp. 3d at 20.

Furthermore, even if Applicants' requests had more broadly sought the identities of all those witnesses whom Perles interviewed in anticipation of litigation—which they do not—the *Savignac* court also found that even a separate part of the discovery request asking the plaintiffs to disclose "the identities of the persons with whom they

---

[10] Notably, the complaint in the Sotloff Action did not concern solely the Purported Transfer Record but also contained a slew of other allegations (albeit equally meritless ones), none of which the Application seeks information about; therefore, this is not the quest for a comprehensive witness list that Perles paints it out to be.  *See* JA280-82 (now-vacated order from Judge Middlebrooks describing various other allegations apart from the Purported Transfer Record, including conferences where cash was allegedly distributed to terrorist groups, albeit with little explanation of Applicants' involvement).

consulted in anticipation of this litigation" was permissible, explaining that "although a list of witnesses an attorney has interviewed in anticipation of litigation can, at times, permit a requesting party impermissibly to glean its opponent's strategy, that is not the case here." *Id.* at 19. In that scenario, Applicants would "have requested the names . . . not as a method to glean [Perles's] litigation strategy, but rather as an effort to identify witnesses who might have factual information relevant to an important issue in the case," which is "both relevant and not subject to the work-product privilege." *Id.* at 21. As already discussed, Applicants have no interest in discerning Perles's litigation "strategy," which was dubious and reckless at best; Applicants are interested only in learning who created the Forged Record and how it came to be provided to Perles.

Moreover, even if the requested discovery were somehow attorney work product, courts have made clear that *factual* work product is afforded less protection than opinion work product, and that "[d]iscovery may be had into factual work product upon a party showing 'substantial need for the materials to prepare its case' and that it 'cannot, without undue hardship, obtain their substantial equivalent by other means.'"

*Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting Fed. R. Civ. P. 26(b)(3)(A)); *see also Savignac*, 586 F. Supp. 3d at 21 n.1 (noting that it did not need to reach this analysis because "the work-product privilege does not apply").  The requested discovery is critical, even necessary, to the contemplated proceeding in France that will seek to hold civilly and criminally accountable those who created the Forged Record, and Applicants cannot prepare their case without judicial assistance in obtaining such discovery from Perles, the sole gatekeeper to the requested information.

Finally, Perles also contends that the discovery request is "particularly insidious because Perles has other pending cases in which the [Applicants] are named parties," Br. 45, but this is highly misleading. Perles cites to the *Force* complaint, which had *already been dismissed with prejudice as to Applicants at the time of filing* of Perles's principal brief. *See Force v. Qatar Charity*, 2025 WL 43163 (E.D.N.Y. Jan. 7, 2025). Perles's further citation to the *Henkin* complaint is also misleading given that *QNB was already dismissed as to that complaint years ago*, with QC to renew its earlier motion to dismiss shortly, given that multi-year jurisdictional discovery against QC has been entirely unfruitful.  *See*

*Henkin v. Qatar Charity*, 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023). None of Perles's cases against Applicants ever made it past the motion-to-dismiss stage, except for the ill-fated Sotloff Action in which the court's initial order denying QNB's and QC's motions to dismiss was later vacated and the case dismissed with prejudice. Again, Applicants have no need for, and no interest in, learning about Perles's litigation "strategy."

### 2. Perles's Argument Concerning Purported Security Risks Is Unsupported by Law or Fact.

Perles provides no basis to establish that the Application, as Perles argues, "violate[s], frustrate[s], or offend[s] U.S. public policy." Br. 48. In its lengthy exposition in this section, Br. 48-51, the only case Perles cites is *Republic of Gambia v. Facebook, Inc.*, 575 F. Supp. 3d 8, 11 (D.D.C. 2021), in arguing that the court there properly "rejected [a] § 1782 application on the grounds that U.S. law and public policy concerns over privacy protection would prohibit the disclosure of requested documents." Br. 48. That assertion is misleading, though, as that case hinged only on the Stored Communications Act as it related to Facebook posts, not, as Perles contends, on general "public policy concerns." *See Facebook,* 575 F. Supp. 3d at 11 (noting that the "Court need take up only the first"

61

objection by Facebook that the "SCA prohibits Facebook from disclosing these communications" but not the second objection regarding potential abuse of discretion in relation to the *Intel* factors).

Perles's purported factual basis for the security risk argument is even more unfounded.  Taking a particularly offensive tack, Perles renews its attempt to suggest, without any basis, that certain alleged threats to Perles's translator in France may have been made "at the behest of the Qataris," referring to Applicants, "illustrating the measures some individuals are willing to undertake to dissuade witnesses." Br. 49. The district court already rejected these unfounded aspersions below, noting that there was "no attempt whatsoever to attribute the events described" to Applicants in the declaration that Perles provided in support.  JA561 (quoting Dkt. 15 at 18).[11]   And despite Perles's peculiar use of "the Qataris" throughout its brief in an apparent attempt to paint Applicants as the Qatari government and to tie them to various alleged governmental actions, Applicants are *not* governmental entities:   as

---

[11] The district court also properly disregarded Perles's separate argument concerning a foreign lawsuit against *another* bank, "Doha National Bank" (which Applicants understand to refer to Doha Bank), as well as related allegations concerning "Qatari officials."  Br. 50.  Perles barely attempts to connect these allegations to Applicants.

stated, they are a commercial bank and a charity. *See supra* n.1; JA4 ¶ 5; JA392 ¶ 5.

Perles's fanciful and unsupported "security" concerns do not justify denial of the Application. Indeed, if Perles had any evidence on that score against Applicants, it presumably would have proffered it to the district court. The district court therefore did not abuse its discretion in rejecting Perles's various arguments and finding that the third *Intel* factor weighed in Applicants' favor.

### D. The Requested Discovery Is Neither Unduly Intrusive Nor Burdensome.

Finally, the limited and focused Application—which contains just two requests for documents and a single request for a 30(b)(6) deposition (limited to six topics)—is not, under the fourth *Intel* factor, "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. As the district court recognized, even *Perles* did not dispute that the requested discovery is "narrowly targeted." JA563; Dkt. 10 at 28; *see also* Br. 52 (conceding that Applicants' requested discovery is "narrowly tailored").

Perles has no basis to claim on appeal that the district court "refused to even consider Perles' arguments and accordingly abused its discretion" on this fourth *Intel* factor. Br. 52. The district court expressly

considered Perles's concerns about confidentiality, the protection of witnesses, and the attorney work product doctrine, and the court referred back to its lengthier discussion of the same with respect to the third *Intel* factor. JA563 (referencing JA560-62). Because Applicants similarly already address those concerns above, *see supra* Argument Sections I.A, III.C.1-2, Applicants incorporate those same arguments here and therefore do not repeat them. The district court did not abuse its "considerable" discretion in finding that this fourth and final factor also weighed in Applicants' favor. *Lazaridis,* 473 F. App'x at 3-4.

Finally, Perles advances an additional argument in a footnote that "[t]he District Court also erred when it rejected as moot Perles' request to transfer the Application to the Southern District of Florida, which had retained jurisdiction to deal with the disputes concerning the Confidentiality Order," before adding a generic citation to the same effect. Br. 53 n.7. However, a "party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (citation omitted) (finding that party had waived certain arguments "by

referencing them only vaguely in a footnote"). Perles has therefore waived that argument on appeal.

## CONCLUSION

In light of the foregoing, the Court should affirm the district court.

Respectfully submitted,

| | |
|---|---|
| */s/ Douglas H. Hallward-Driemeier* | */s/ John M. Hillebrecht* |
| Douglas H. Hallward-Driemeier | John M. Hillebrecht |
| ROPES & GRAY LLP | Kevin Walsh |
| 2099 Pennsylvania Avenue, N.W. | Jessica A. Masella |
| Washington, DC 20006 | Michael G. Lewis |
| Tel: (202) 508-4600 | Erin Collins |
| Douglas.Hallward-Driemeier@ropesgray.com | DLA PIPER LLP (US) |
| | 1251 Avenue of the Americas |
| | New York, NY 10020-1104 |
| Michael G. McGovern | Tel: (212) 335-4500 |
| ROPES & GRAY LLP | John.Hillebrecht@us.dlapiper.com |
| 1211 Avenue of the Americas | Kevin.Walsh@us.dlapiper.com |
| New York, NY 10036 | Jessica.Masella@us.dlapiper.com |
| Tel: (212) 596-9000 | Michael.Lewis@us.dlapiper.com |
| Michael.McGovern@ropesgray.com | Erin.Collins@us.dlapiper.com |

*Counsel for Petitioner-Appellee Qatar National Bank (Q.P.S.C.)*    *Counsel for Petitioner-Appellee Qatar Charity*

Dated: April 16, 2025

65

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,994 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point type for text and footnotes.

*/s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system which will serve all counsel of record.

*/s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier