ORAL ARGUMENT NOT YET SCHEDULED
No. 25-7029

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

QATAR NATIONAL BANK (Q.P.S.C.); QATAR CHARITY,

*Petitioners-Appellees*,

*v.*

PERLES LAW FIRM, P.C.,

*Respondent-Appellant.*

_____

Appeal from the United States District Court for the District of Columbia
No. 1:24-mc-00035-LLA, Hon. Loren AliKhan

_____

**REPLY BRIEF OF APPELLANT PERLES LAW FIRM, P.C.**

_____

Robert L. Weigel
Robert F. Serio
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave, 47th Floor
New York, NY 10166-0193
(212) 351-4000
rweigel@gibsondunn.com
rserio@gibsondunn.com

Max E. Schulman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8500
mschulman@gibsondunn.com

*Counsel for Respondent-Appellant
Perles Law Firm, P.C.*

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT .........................................................................................................4

I.    THE QATARIS MISCHARACTERIZE THE TRANSFER RECORD, THE CONFIDENTIALITY ORDER, AND THE PROCEEDINGS IN THE SOTLOFF ACTION ...................................4

II.    THE APPLICATION IS BARRED BY ISSUE PRECLUSION ..........7

III.    THE QATARIS FAILED TO SATISFY THE "FOR USE" REQUIREMENT OF SECTION 1782 ..............................................12

IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING THE APPLICATION.......................................................17

    A.    The First *Intel* Factor Weighs Against Granting The Application Because The Qataris Are Not Barred From Making Perles Or The Sotloffs Participants In A Foreign Proceeding...................................................................................17

    B.    The Second *Intel* Factor Weighs Against Granting The Application Because The Qataris' Failure To Select A Forum Means That Receptivity Cannot Be Assessed...............19

    C.    The Third *Intel* Factor Weighs Against Granting The Application Because The Application Circumvents The Work-Product Privilege And The Policy To Protect Witnesses...................................................................................20

    D.    The Fourth *Intel* Factor Weighs Against Granting The Application Because The Discovery Requests Are Unduly Burdensome ...............................................................25

CONCLUSION ...................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Brodie v. Jackson*,
  2014 WL 11813594 (D.D.C. July 7, 2014) ......................................11

*C5 Capital Ltd.*, 2024 WL 1701650 (D.D.C. Apr. 18, 2024)................................13

*Carter-Wallace, Inc. v. Hartz Mountain Indus.*,
  92 F.R.D. 67 (S.D.N.Y. 1981) ...............................................................5

*City of W. Palm Beach v. U.S. Army Corps of Eng'rs*,
  317 F. Supp. 3d 150 (D.D.C. 2018) ......................................................7

*Connors v. Tanoma Mining Co.*,
  953 F.2d 682 (D.C. Cir. 1992) ............................................................10

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ..............................................................8

*Day v. Johns Hopkins Health Sys. Corp.*,
  907 F.3d 766 (4th Cir. 2018) ..............................................................24

*Dushkin Publ'g Grp., Inc. v. Kinko's Serv. Corp.*,
  136 F.R.D. 334 (D.D.C. 1991) ............................................................12

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F. 3d 1095 (2d Cir. 1995) ..............................................................20

*Force v. Qatar Charity*,
  2025 WL 43163 (E.D.N.Y. Jan. 7, 2025) ............................................23

*Hall v. Balt. Police Dep't.*,
  2025 WL 509130 (D. Md. Feb. 13, 2025) ............................................22

*Henkin v. Qatar Charity*,
  2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023)......................................23

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004).................................................12, 17, 19, 20, 25

*Jiangsu Steamship Co. v. Success Superior Ltd.*,
2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015) .......................................19

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
895 F.3d 238 (2d Cir. 2018) ..............................................................26

*Lazaridis v. Int'l Centre for Missing & Exploited Children*,
760 F. Supp. 2d 109 (D.D.C. 2011) ............................................18, 19

*Lugosch v. Pyramid Co. of Onondaga*,
435 F.3d 110 (2d Cir. 2006) ..................................................................5

*Mangouras v. Squire Patton Boggs*,
980 F.3d 88 (2d Cir. 2020) ..................................................................13

*Mussington v. Deborah Brosnan & Assocs., LLC*,
708 F. Supp. 3d 1 (D.D.C. 2023).........................................................17

*Islamic Republic of Pakistan v. Arnold & Porter Kaye Scholer LLP*,
2019 WL 1559433 (D.D.C. Apr. 10, 2019).........................................24

*In re Novalpina Cap. Partners I GP S.À.R.L.*,
2025 WL 1160854 (S.D.N.Y. Apr. 21, 2025) .....................................15

*In re of Lucille Holdings Pte. Ltd.*,
2022 WL 1421816 (D.D.C. May 5, 2022).............................................15

*In re Pishevar*,
2023 WL 2072454 (D.D.C. Feb. 17, 2023).........................................14

*Proctor v. District of Columbia*,
74 F. Supp. 3d 436 (D.D.C. 2014).......................................................11

*Santiago v. Honeywell Int'l, Inc.*,
2017 WL 3610599 (S.D. Fla. Apr. 6, 2017).........................................11

*Savignac v. Jones Day*,
586 F. Supp. 3d 16 (D.D.C. 2022).........................................20, 21, 22

*Scooper Dooper, Inc. v. Kraftco Corp.*,
494 F.2d 840 (3d Cir. 1974) ..................................................................9

*Shapiro v. U.S. Dep't of Just.*,
    969 F. Supp. 2d 18 (D.D.C. 2013)........................................................................23

*In re Shefsky*,
    2024 WL 2275215 (D. Nev. May 20, 2024) ......................................................13

*United States v. All Assets Held at Bank Julius Baer & Co.*,
    270 F. Supp. 3d 220 (D.D.C. 2017)....................................................................21

*United States v. Sealed 1*,
    235 F.3d 1200 (9th Cir. 2000) ............................................................................24

# GLOSSARY

| | |
|---|---|
| Application | Qatar National Bank (Q.P.S.C.) and Qatar Charity's 28 U.S.C. § 1782 application (JA1) |
| Confidentiality Order | Confidentiality order entered by Judge Middlebrooks in *Sotloff v. Qatar Charity, et al.*, No. 22-cv-80726 (S.D. Fla.) (Middlebrooks, J.) (JA402) |
| Perles | Perles Law Firm, P.C. |
| Qataris | Qatar National Bank (Q.P.S.C.) and Qatar Charity |
| Charity | Qatar Charity |
| Bank | Qatar National Bank (Q.P.S.C.) |
| Transfer Record | Bank transfer record that allegedly documented a financial transaction linking Qatar National Bank (Q.P.S.C.) and Qatar Charity to the terrorist that murdered Steven Sotloff (JA334) |
| Sotloff Action | *Sotloff v. Qatar Charity, et al.*, No. 22-cv-80726 (S.D. Fla.) (Middlebrooks, J.) |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court below abused its discretion and committed numerous errors in granting the Qataris' Application to take discovery pursuant to 28 U.S.C. § 1782.[1] Although the Qataris talk of foreign jurisdictions and spin tales of anonymous forgers overseas, this case actually began much closer to home—in a courtroom in the Southern District of Florida. There, Judge Donald Middlebrooks presided over a dispute between the Qataris and Perles over the Qataris' alleged involvement in a terror financing scheme that led to the murder of journalist Steven Sotloff. The Transfer Record at the center of this dispute—which purported to document a financial transaction by which the Qataris allegedly provided $800,000 to a known terrorist, who later ordered the murder of Steven Sotloff—formed the basis for the entry of the Confidentiality Order. The Qataris' counsel have the Transfer Record. They just can't use it because the terms of the Confidentiality Order limited access to the documents in question to the Qataris' counsel.

---

[1] Perles' Opening Brief ("Opening Br.") refers to Bank and Charity collectively as "the Qataris"—a designation that they claim is offensive. No offense was intended, and Perles remains perplexed why the Qataris would take offense to a designation merely noting their association to the country of Qatar, where appellees are incorporated and headquartered. Furthermore, 50% of Bank is owned by the Qatari government—and the Board of Charity is composed of government officials and members of the Qatari Royal Family. JA49 ¶ 33; JA278. For purposes of continuity, Perles will continue to refer to Bank and Charity as "the Qataris."

1

When the Qataris pointed out inconsistencies on the face of the Transfer Record that rendered questionable the document's authenticity, Perles expanded its prior investigation into the authenticity of the document, meeting with a translator and a potential witness at a law office in Paris, France in 2023. During this meeting, the translator reported to Perles and French law enforcement that their car was broken into, evidentiary materials were stolen, and a handwritten note in Arabic was left behind which read: "This is a warning." These disturbing events confirmed Perles' suspicion that criminal actors would seek to intimidate and harass those associated with the Sotloff Action (or perceived to be aligned against Qatari interests).

Nevertheless, in light of the continuing uncertainty about the Transfer Record's provenance, the parties submitted a joint motion to dismiss the Sotloff Action. Still, Perles has never conceded, and no court has found, that the Transfer Record was a forgery designed to defame the Qataris. To the contrary, Perles believes that this document could have been evidence of a real-world act of terror financing by which a multilingual group of terrorists and their supporters, who were operating in a chaotic environment and under time pressure, created the document to paper over an illicit transaction.

Although Judge Middlebrooks expressly retained jurisdiction to deal with disputes concerning the Confidentiality Order, the Qataris made no effort to modify,

2

vacate, or seek relief from the Florida District Court—despite the fact that Judge Middlebrooks was in the best position to evaluate the confidentiality issues at bar. Instead, the Qataris decided to go around Judge Middlebrooks and use their Application to pursue Perles in a different federal court.

The first of the District Court's numerous errors was that it declined to bar the Application on issue preclusion grounds in deference to the standing Confidentiality Order.  Despite the Qataris' attempts to smooth this error over by inventing picayune reasons to distinguish the Sotloff Action from the case at hand, both cases pose an identical question: whether the identities and locations of the persons involved in creating, witnessing, disseminating, and communicating with Perles about the Transfer Record deserve protection.

Second, the District Court also failed to properly assess § 1782's statutory and discretionary factors.  With respect to the statute's "for use" requirement, the Qataris fail to show how their "reasonably contemplated" foreign proceeding is anything but a fishing expedition.  Indeed, the Qataris even admit that they "*do not know* in which specific foreign jurisdiction they will bring their claims before seeing the discovery resulting from this Application," Dkt. 1, at 15 (emphasis added), and seek § 1782 discovery to "*ascertain* further geographical details," *id.* at 13 (emphasis added).

Finally, even if the Qataris satisfied the statutory factors (they did not), the District Court abused its discretion in holding that § 1782's discretionary factors

3

counseled in favor of granting the Application.  The Qataris use the § 1782 process to lodge invasive discovery requests against Perles, an anti-terrorism law firm that they frequently litigate against.  Not only does this discovery seek information that could reveal Perles' confidential attorney work product, but it also implicates Perles' obligation to protect potential fact witnesses, and its trusted network of investigators, translators, and experts, from retaliation by foreign governments or actors.

This Court should decline to follow the Qataris' attempts to weaponize § 1782 to punish Perles for having the temerity to pursue civil claims on behalf of victims of terror.  Accordingly, the District Court's order should be reversed and the Application denied.

## **ARGUMENT**

## I.    THE QATARIS MISCHARACTERIZE THE TRANSFER RECORD, THE CONFIDENTIALITY ORDER, AND THE PROCEEDINGS IN THE SOTLOFF ACTION

The Qataris continue to mischaracterize the determinative factual circumstances.

First, the Qataris appear to suggest that, in the Sotloff Action, Perles had some illicit reason for not being forthcoming with the Transfer Record.  Not so.  Perles believed then—just as it does now—that the Transfer Record contains highly sensitive information that should not be produced without significant confidentiality protections and use limitations.  Further, the Qataris' statement that Perles "only"

4

produced the Transfer Record "after being ordered to do so" by Judge Middlebrooks, Answering Br. 2, is a mischaracterization. Perles in fact was willing to produce the Transfer Record with appropriate protections in place.

Perles does not deny that, based on inconsistencies noted by the Qataris, the Transfer Record cannot be authenticated. Indeed, that is why the Sotloffs, represented by Perles, joined the Qataris' request to dismiss the Sotloff Action. But the Qataris' assertion that the Transfer Record is nothing more than a calculated forgery designed to defame them fails to account for the distinct possibility that the inconsistencies on the face of the document are attributable to the circumstances of its creation by a terrorist actor—and not the misdeeds of some anonymous group of forgers. It is plausible that, in order to create a receipt for a substantial cash transfer, terrorist actors speaking different languages quickly cobbled together a makeshift financial document.

Next, the Qataris mischaracterize the Confidentiality Order, which covers the materials sought in this action.[2] It is true that the Confidentiality Order "does not confer blanket protections." JA403 § 1. Instead, as is the case for all protective

---

[2] The cases cited by the Qataris for support on their contrary argument are inapposite. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) (focusing on changes to a confidentiality order made by the court that issued the order in question); *Carter-Wallace, Inc. v. Hartz Mountain Indus.*, 92 F.R.D. 67, 69 (S.D.N.Y. 1981) (dealing with a discovery dispute in which one of the parties was bound by a confidentiality order and the other was not).

orders, it extends only to those materials designated according to the procedures set forth in its provisions.  JA406 §§ 2.17, 3 (describing the Confidentiality Order's definition for "Protected Material" and outlining the Order's scope).  Because the Transfer Record was such a designated document, *see* JA6 n.2, the terms of the Confidentiality Order apply in full.  The Qataris erroneously suggest that the protections of the Confidentiality Order, once triggered, would extend only to the factual content of the Transfer Record.  Answering Br. 30.  But the Confidentiality Order covers not only the factual content of the Transfer Record *but also* "any testimony [or] conversations . . . that *might reveal* Protected Material."  JA406 § 3 (emphasis added).  Whether or not the Qataris are seeking to obtain an unredacted version of the Transfer Record is therefore immaterial.  The Qataris *are* openly seeking the identity of "the individual(s) who gave, sent, shared or otherwise communicated" the Transfer Record to Perles, JA21, and "the identities of individuals with whom" the Transfer Record was discussed, JA23.  The only quasi-legitimate reason the Qataris would want the identities of these individuals, though, is to discuss the protected contents of the Transfer Record with them.  The Confidentiality Order precludes this.

Because the Confidentiality Order is still in effect and Judge Middlebrooks expressly retained jurisdiction to enforce its terms, JA407 § 4.2, the Qataris should have petitioned Judge Middlebrooks to modify or lift the Confidentiality Order

before pursuing this action.  Or, as requested, the District Court, once made aware of the Confidentiality Order, should have transferred the action to the Southern District of Florida given that "considerations of convenience and the interest of justice" clearly support such a transfer, instead of substituting its own view of the continued necessity of Judge Middlebrooks' order.  *City of W. Palm Beach v. U.S. Army Corps of Eng'rs*, 317 F. Supp. 3d 150, 153 (D.D.C. 2018).

Despite what the Qataris argue, Section 8 of the Confidentiality Order was never intended to apply to the circumstances here.  Section 8 clearly contemplates one situation, and one situation only—that is, what a non-designating party should do if served by a non-party with a subpoena for materials disclosed to such party under the Confidentiality Order.  JA414 § 8.  To apply Section 8 to the present set of facts invites absurd results—among other things, Perles would be obligated to notify itself of the Qataris' subpoena, JA414 § 8(a), and it would also need to notify the Qataris of the Confidentiality Order, JA414 § 8(b).

## II.    THE APPLICATION IS BARRED BY ISSUE PRECLUSION

Well-established principles of issue preclusion required that the District Court rebuff the Qataris' attempt to rehash an issue that the parties have already extensively litigated and that has already been conclusively decided by another court.

The three-part issue preclusion test is easily satisfied here.  First, the issue currently being litigated before this Court is identical to the issue decided in the

Sotloff Action. The central issue in both matters has always been whether the identities and locations of the persons involved in creating, witnessing, disseminating, and communicating with Perles about the Transfer Record deserve protection. The Qataris attempt to muddy the waters by implying that Judge Middlebrooks' decision resolved only a minor disagreement between the parties over the scope of the Order's "Attorneys' Eyes Only" designation. Answering Br. 36-37, 39-40. But that ignores what was actually decided.

It is clear from Judge Middlebrooks' entry order that the substance of the dispute over the Confidentiality Order involved the exact same issues motivating this litigation. *See* JA423 ("Plaintiffs fear that by disclosing this document, and others like it, to people at QNB and QC, they will be putting their witnesses in serious danger."). The Confidentiality Order was not conditioned on the authenticity of the Transfer Record, and any alleged change in the document's reliability as an article of evidence is therefore of no consequence. *See Cutler v. Hayes*, 818 F.2d 879, 890 n.88 (D.C. Cir. 1987) (finding that, notwithstanding the introduction of new evidence, the doctrine of issue preclusion should still be applied as the "new evidence . . . was immaterial to the legal basis" on which the earlier finding rested). Instead, the foundational fact underlying Judge Middlebrooks' decision remains the same—namely, that those who dare to oppose the Qataris may face serious danger.

*See* JA424 (weighing not only the plausibility of the allegations found in the complaint but also charges of witness intimidation in other cases).

This Court should also reject the Qataris' argument that issue preclusion is inapplicable here due to a change in the controlling facts, Answering Br. 37, as there has been no change in the controlling facts.[3] The Qataris can point to nothing to suggest that the risks to the involved persons has decreased. Perles' decision to join the Qataris' request to dismiss the Sotloff Action does not mean that Perles endorsed the Qataris' theory that the Transfer Record had been "forged." *See* JA343-44 ("[The Sotloffs] maintain that there is insufficient basis to conclude that the Purported Transfer Record is forged."). There has not been any finding by any court that the record is a forgery, despite the Qataris' misleading portrayal of the circumstances surrounding the dismissal of the Sotloff Action. *Compare* Answering Br. 34 (claiming that the "identification of numerous, incontrovertible indicia of fraud . . . convinced Judge Middlebrooks to dismiss the action with prejudice"), *with* JA371 (Judge Middlebrooks stating simply that the parties had asked him to vacate his order denying the motion to dismiss and that he "find[s] good cause to grant" the request).

---

[3] The exception for changed facts is narrow and should not be allowed to swallow the rule. "Carried to its extreme, the concept of changed factual circumstances could totally undermine the application of collateral estoppel," as "[r]are would be the case in which counsel could not conjure up some factual element that had changed between adjudications." *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 846 (3d Cir. 1974).

Second, the issue at stake in both this case and the Sotloff Action—the safety of witnesses to the Transfer Record—was actually litigated by both parties in the Sotloff Action and was essential to Judge Middlebrooks' decision. Indeed, Judge Middlebrooks entered the Confidentiality Order only after he had fully considered the arguments set out in the parties' briefing. JA512 (Perles' Motion); JA520 (The Qataris' Motion); JA422 (Judge Middlebrooks' Entry Order). Because this issue clearly formed the sole and exclusive basis for the entry of the Confidentiality Order, *see* JA423-24, the Qataris' citation to *Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684-85 (D.C. Cir. 1992) is inapposite. Answering Br. 38. In *Connors*, the district court that issued the first decision had offered multiple legal bases for its reasoning, and it was thus impossible for subsequent courts reviewing the decision to determine on which basis the original court made its decision. *Id.* Applying the doctrine of issue preclusion was therefore inappropriate under the circumstances. *Id.* The rule is not that issue preclusion is inapplicable whenever there is even the slightest bit of uncertainty about whether the disputed issues are identical. Such a result would hollow out the doctrine—as any attorney can identify immaterial distinctions between issues.

Third, the application of issue preclusion would not work a basic unfairness to the Qataris because they had a full and fair opportunity to litigate the issue here during the Sotloff Action. Generally, "a compelling showing of unfairness" is

10

necessary before a court will refuse to afford a judgment "preclusive effect on [the] grounds that [a] party lacked adequate incentive to litigate in the first proceeding." *Proctor v. District of Columbia*, 74 F. Supp. 3d 436, 453 (D.D.C. 2014) (internal citation and quotations omitted). The Qataris cannot plausibly claim that they had less incentive to litigate this issue in the Sotloff Action than they do now. Answering Br. 39. It cannot be the case that fending off allegations of terror financing is less important than bringing a hypothetical lawsuit. The Qataris' citation to *Brodie v. Jackson*, 2014 WL 11813594, at *4 (D.D.C. July 7, 2014), *aff'd*, 630 F. App'x 1 (D.C. Cir. 2015), is also easily distinguishable. The *Brodie* court only found that the plaintiff had lacked a sufficient "incentive to litigate the issues . . . in the prior proceeding" because those issues had not even been raised or "decided in [the plaintiff's] prior case." *Id.* Here, on the other hand, the exact same issue had already been raised in the Sotloff Action—and in the context of a lawsuit of far greater importance.

Moreover, the District Court ought to have treated the Confidentiality Order with appropriate deference. Courts "generally respect one another's protective orders." *Santiago v. Honeywell Int'l, Inc.*, 2017 WL 3610599, at *2 (S.D. Fla. Apr. 6, 2017) (internal citations and quotations omitted). Indeed, courts "which have been called upon to decide discovery motions that involve requests to modify or terminate a protective order previously issued by another court, whether state or

11

federal, have frequently felt constrained by principles of comity [and] courtesy." *Id.* (internal citations and quotations omitted); *see also Dushkin Publ'g Grp., Inc. v. Kinko's Serv. Corp.*, 136 F.R.D. 334, 335 (D.D.C. 1991) (finding that principles of comity obligated the court to respect another court's protective order). The District Court here demonstrated no such regard for the well-reasoned decision of its sister court. *See* JA556 (District Court making only an offhand reference to the Confidentiality Order in its issue preclusion analysis).

Under clearly established principles of issue preclusion, this Court should reverse the decision below and deny the Application. The Qataris, if they wish to alter its provisions, should petition the Southern District of Florida for relief.

## III. THE QATARIS FAILED TO SATISFY THE "FOR USE" REQUIREMENT OF SECTION 1782

It was clear error for the District Court to grant the Application—as the Qataris' failure to satisfy the "for use" element of § 1782 is stunningly apparent. The "for use" requirement helps ensure that a hypothetical foreign proceeding is within reasonable contemplation—and not an impermissible fishing expedition. To be clear, Perles does not dispute the proposition that a "proceeding" under § 1782 need only be pending or imminent to satisfy the statute. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). Nevertheless, a petitioner must still "provide sufficient 'objective indici[a]' that the [foreign] proceedings were, at any point, more

than merely speculative." *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 101 (2d Cir. 2020) (internal citation omitted).

Here, the Qataris admit that they: "*do not know* in which specific foreign jurisdiction they will bring their claims before seeing the discovery resulting from this Application," Dkt. 1, at 15 (emphasis added), and seek § 1782 discovery to "*ascertain* further geographical details," *id.* at 13 (emphasis added). Thus, at bottom, the Application here reveals nothing more than an intention to file some type of suit, in some undetermined jurisdiction, at some undefined point in time, against some unnamed individual(s). *See In re Shefsky*, 2024 WL 2275215, at *5 (D. Nev. May 20, 2024) (holding that an application that is "bereft of crucial elements for initiating litigation—such as the legal theory for bringing the action, the evidence, the supporting factual bases, the parties they intend to name, or a timeframe as to when those actions would be commenced" is "more likely to *hinge* on the receipt of discovery materials and therefore be 'speculative'") (emphasis in original).

As to the "*who*," the Qataris have failed to identify any putative defendant(s) for their contemplated proceeding. Although the Qataris cite cases that purport to stand for the proposition that § 1782 permits "identity-confirming discovery," these cases are easily distinguishable. In *C5 Capital Limited*, 2024 WL 1701650 (D.D.C. Apr. 18, 2024), the petitioner had *already identified* the target of their foreign proceeding by name and merely wanted "to *verify* that [the litigation target] will be

the right defendant in the forthcoming lawsuit." *Id.* at *2 (emphasis added).  The Qataris hang their hopes on *In re Pishevar*, 2023 WL 2072454 (D.D.C. Feb. 17, 2023), a case in which the petitioner, who did not know the name of the litigation target, had at least *some* information to identify the target's gender, location, and profession.  *See id.* at *1 (noting that the litigation target was a "male lawyer based in the UK").  The Qataris posture as if they have amassed a trove of identifying information about the Anonymous Source.  But, at bottom, the only thing that the Qataris can state about the *identity* of this individual is that he or she was located in Paris, France at some time in 2023.  The Qataris cannot prop up their "for use" argument by simply "identifying" the Anonymous Source as "the person who (we allege) acted wrongfully against us."

With respect to the "*where*," the Qataris' Answering Brief does nothing to rehabilitate their failure to identify a forum for their contemplated foreign litigation. Putting aside the fact that the Qataris have no reasonable basis to conclude that the Anonymous Source is still located in France, the Qataris continue to ignore the weight of their own statements, which reveal that France was only identified as a *possible* forum.  As the Qataris concede, they seek to use their Application to "*ascertain* further geographical details." Dkt. 1, at 13 (emphasis added).  Similarly, the Qataris concede that they "*do not know* in which specific foreign jurisdiction they will bring their claims before seeing the discovery resulting from this

Application." *Id.* at 15 (emphasis added); *see also id.* at 16 (Qataris noting they "*do not yet fully know* in which foreign jurisdiction they will bring their claims*"*) (emphasis added). The Qataris' statements reveal that they have again put the cart before the horse. *See In re Novalpina Cap. Partners I GP S.À.R.L.*, 2025 WL 1160854, at *21 (S.D.N.Y. Apr. 21, 2025) (holding that § 1782 was not intended to be "used as a vehicle to assist parties in determining whether or not they have a claim that can be filed in a foreign jurisdiction").

The Qataris reframe their equivocal statements and their subsequent failure to concretely identify a forum as merely their honest intention to be "transparent" about the fact that they "reserve the right to bring claims" in other jurisdictions. Answering Br. 45. But this clever reframing does not change the fact that the District Court should never have credited these "cursory" references to *potential* forums. *In re of Lucille Holdings Pte. Ltd.*, 2022 WL 1421816, at *14 (D.D.C. May 5, 2022) (internal citation and quotations omitted). And although the Qataris blame their inability to present a coherent case on Perles' purported "intransigence and stonewalling," Answering Br. 45, what the Qataris fail to appreciate is that Perles has a right and obligation to protect this highly sensitive and confidential information—especially as it relates to Perles' network of investigators, translators, and experts.

As to the "*what*," the Qataris have no basis to assert what claims they contemplate bringing in their hypothetical foreign proceeding. The claims cannot

15

be identified without first knowing the forum and what causes of action can be asserted under its laws.  In response to Perles' arguments that the Qataris have not shown that they suffered any kind of cognizable injury or have a viable claim even worth pursuing in any forum, the Qataris' Answering Brief returns home to their unsubstantiated speculation that the *only* possible explanation for the Transfer Record's creation is that an Anonymous Source—and possibly some group of unknown conspirators—forged the Transfer Record in an effort to defame the Qataris.  But as explained above, there is a plausible alternative explanation for the Transfer Record's creation as a hastily written receipt for a real-world event of terror financing.  And as much as the Qataris tout the declaration of their French attorney who analyzed their hypothetical claims, that evidence is undermined by their failure to concretely identify a forum.

Finally, as to the "*when*," the Qataris have failed to provide sufficient evidence that their hypothetical foreign proceeding will be initiated in a timely fashion, since the Application is premised on the filing of an *unspecified claim* against some *unknown resident in an unknown country* in a *yet-to-be-determined forum*.  The Qataris cannot evade § 1782's statutory requirement by simply hiring foreign counsel and providing them with enough allegations to craft a cursory declaration.  The Qataris' failure to dedicate any substantive effort—outside of filing this

16

Application—towards uncovering the identity of the "alleged forgers" also cuts against their claims of readiness.

If the "for use" prong of § 1782 is to be given any meaning, the District Court must be reversed and the Application denied.

## IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING THE APPLICATION

The District Court clearly abused its discretion in evaluating the factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Each of the *Intel* factors weighs against the Application.

### A.    The First *Intel* Factor Weighs Against Granting The Application Because The Qataris Are Not Barred From Making Perles Or The Sotloffs Participants In A Foreign Proceeding

The first *Intel* factor, which considers "whether the target of the discovery request is a participant in the foreign or international proceeding," *Mussington v. Deborah Brosnan & Assocs., LLC*, 708 F. Supp. 3d 1, 12 (D.D.C. 2023), weighs heavily against the Application. Given that the Qataris have failed to provide any enforceable guarantee that Perles (and the Sotloffs) will not be targeted in the Qataris' hypothetical suit abroad, it must be recognized that Perles and the Sotloffs could still be named as defendants.

This lingering uncertainty could have been resolved if the Qataris had provided a binding agreement or release acknowledging that they would not sue Perles or the Sotloffs in a future foreign proceeding. Perles outlined this suggestion

17

in its Opening Brief, *see* Opening Br. 36, but so far, the Qataris have not even deigned to acknowledge Perles' offer, *see* Answering Br. 49-51. Instead, the Qataris claim that their statements in this action provide incontrovertible proof that "neither Perles nor the Sotloffs will be participants in the contemplated foreign proceedings." *Id.* at 50. Statements made in court filings are not, however, enforceable in the same way that a binding agreement is. Even if the Qataris do not plan to sue Perles or the Sotloffs at this moment, there is nothing stopping the Qataris from changing their minds. Perles cannot afford to rely on such gratuitous promises, especially when the Qataris have repeatedly insinuated that Perles is somehow complicit in the so-called "forgery" of the Transfer Record. *See id.* at 6 (alleging that Perles "inaccurately represent[ed]" certain information to Judge Middlebrooks); *id.* at 25 (claiming that Perles had made "misrepresentations about the [Transfer Record's] authenticity").

Lastly, the Qataris' efforts to distinguish *Lazaridis v. International Centre for Missing & Exploited Children*, 760 F. Supp. 2d 109 (D.D.C. 2011) are entirely unpersuasive. The *Lazaridis* court did state, as the Qataris contend, that the organizations responding to the petitioner's application were "necessarily participants in the Greek prosecution" because they employed the individuals under investigation in Greece. *Id.* at 114. But the court concluded that, even if the respondents were nonparties, the first *Intel* factor would still counsel *against* granting the application because the respondents were "suspects who may later

18

become defendants." *Id.* (internal citation and quotations omitted).  Consequently, the holding in *Lazaridis* supports reversal of the decision below.

**B.    The Second *Intel* Factor Weighs Against Granting The Application Because The Qataris' Failure To Select A Forum Means That Receptivity Cannot Be Assessed**

The second *Intel* factor, which analyzes "the character of proceedings underway abroad, and the receptivity of the foreign government" to the requested discovery, cuts squarely against the Application.  *Intel*, 542 U.S. at 244.  Despite loading their brief with analysis about the receptivity of French courts, the problem remains that the Qataris have not committed to any jurisdiction—making it impossible for Perles to offer any detailed evidence to refute the Qataris' claims of receptivity or for this Court to evaluate the factor.  *Jiangsu Steamship Co. v. Success Superior Ltd.*, 2015 WL 3439220, at *7 (S.D.N.Y. Feb. 5, 2015) ("Without knowing where the proceedings that [the petitioner] contemplates will be brought, it is impossible to ascertain whether the second factor is satisfied, since this Court can only guess whether a foreign country's tribunals would look favorably on providing comparable discovery to litigants in American courts.").

The reality is that France has only a tenuous connection to this case and the Qataris could try bringing suit in any number of jurisdictions other than France. Informing this Court, moreover, that many of the potential jurisdictions in which the Qataris would bring an action are unfriendly to the discovery sought here is not the

19

type of "speculative foray" that courts discourage.  *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F. 3d 1095, 1100-01 (2d Cir. 1995).  This Court is not even at the stage at which it could ask itself whether parsing the specifics of another country's law would be appropriate.

The District Court therefore abused its discretion in ruling that this factor weighed in favor of granting the Application.

**C.    The Third *Intel* Factor Weighs Against Granting The Application Because The Application Circumvents The Work-Product Privilege And The Policy To Protect Witnesses**

The District Court's conclusion that the third *Intel* factor weighed in favor of the Qataris was a clear abuse of discretion.  In light of Perles' legitimate interest in protecting its work product and the safety of witnesses, this factor, which assesses whether an application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," cuts against the Qataris.  *Intel*, 542 U.S. at 265.

Contrary to the Qataris' assertion, *Savignac v. Jones Day*, 586 F. Supp. 3d 16 (D.D.C. 2022) did not hold that the "identities of witnesses who have knowledge of specific issues in the case" are proper subjects of disclosure.  Answering Br. 57.  Such an interpretation would undermine the integrity of work-product protections— as litigation adversaries would be able to glean who the most important witnesses are by simply couching their identification requests in terms of key issues.  This

would allow parties to gain insight into their opponents' litigation strategy—in contravention of work-product principles. *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*. 270 F. Supp. 3d 220, 225 (D.D.C. 2017) (holding that the "better-reasoned cases" distinguish requests that seek "the identification of persons with knowledge about the claims or defenses (or other relevant issues)" from those that seek "the identification of persons who have been contacted or interviewed by counsel concerning the case") (internal citation and quotations omitted).

Rather, the *Savignac* court stated that "the[] circumstances" in that case— where the allegations that lawyers interviewed by the plaintiffs had corroborated the plaintiffs' theory were being used as a sword while their identities were being shielded from disclosure—"plainly distinguish[ed] Defendants' interrogatory from the requests in *All Assets Held* and other decisions that have deemed lists of interviewees to be protected under the work-product privilege." *Id.* at 21.  The operative word here is "circumstances"—meaning, the facts of the case and the implications of this information—not the type of request writ large.

The Qataris' argument further falters because a key consideration at issue in *Savignac* was whether the request *did or did not* allow a party to glean its opponent's strategy, not what the *intention* of the party seeking the request was.  The District Court determined that the Qataris did not seek their discovery "in order" to glean Perles' litigation strategy—but then did not analyze whether the gleaning *would or*

*would not* occur.   JA562.   Unlike in *Savignac*—which concerned prelitigation consultations with attorneys who played no further role in the case—the disclosure here would: (1) reveal Perles' litigation strategy; and (2) instill a fear that any investigative efforts might lead to a required disclosure of counsel's legal thoughts and processes.  Notably, the Qataris do not dispute that the discovery would allow them to glean Perles' litigation strategy.  Rather, they assert that they have "no interest in discerning [the] 'strategy.'" Answering Br. 59.  But again, *intention* is not the determinative factor.

One of the Qataris' discovery requests asks Perles to trace every investigator, translator, expert, and witness it contacted about the Transfer Record.  But the identities of this network of associates is *bona fide* opinion work product and is not subject to discovery.  Even if the identity of the Anonymous Source were to be held discoverable, this sweeping further request is surely a step too far—as it would force Perles to give a recurring litigation opponent an intimate look into its legal operations and strategies.  Further, because this information is clearly opinion work product—which is virtually undiscoverable—the Qataris' argument that their "substantial need" for this information justifies its disclosure is flatly wrong.  *See Hall v. Balt. Police Dep't.*, 2025 WL 509130, at *13 (D. Md. Feb. 13, 2025) (noting that investigative work plans are opinion work product and not subject to disclosure regardless of substantial need).

22

Finally, it is the Qataris that have misled the Court about their history of litigation with Perles. Although the plaintiffs in *Force v. Qatar Charity* withdrew their appeal after Perles submitted its Opening Brief, *see* No. 20-2578 (E.D.N.Y Mar. 20, 2025), Dkt. No. 94, Perles remains opposite Charity in *Henkin v. Qatar Charity*, No. 21-5716 (E.D.N.Y.). Charity's purported plan to file a renewed motion to dismiss "shortly" carries no weight.[4] Additionally, it cannot be lost on this Court that Perles is likely to bring similar litigation against the Qataris, or other organizations, in the future. *See Shapiro v. U.S. Dep't of Just.*, 969 F. Supp. 2d 18, 29 (D.D.C. 2013) (recognizing that disclosure of work product connected to prior litigation can harm the interests of the attorney and client even after the prior litigation is resolved, particularly in cases involving recurring, parallel factual settings and identical legal and policy considerations).

---

[4] Despite the government of Qatar's well-documented history of retaliating against witnesses (that doubtless chills others from coming forward), the plaintiffs in *Henkin* survived Charity's previous motion to dismiss because the court found that the "plaintiffs could plausibly allege that [Charity] exercised some control over [the defendant bank]. *Henkin v. Qatar Charity*, 2023 WL 2734788, at *12 (E.D.N.Y. Mar. 31, 2023). This control was part of an alleged scheme—similar to the one in the Sotloff Action—through which Charity transferred money to Hamas, which used the funds to kill American citizens, according to the guilty plea of a former Charity employee who was convicted in Israel for his involvement. *Id.* at *2. The other dismissals in *Force* and *Henkin* were on personal jurisdiction grounds—and should not be construed as an indication of the merits of these cases or similar suits brought by Perles. *See id.* at *10; *Force v. Qatar Charity*, 2025 WL 43163, at *1 (E.D.N.Y. Jan. 7, 2025).

The Qataris' response to Perles' concerns about witness safety are also puzzling. The protection of witnesses from intimidation is a public policy concern of the utmost importance—as "the prospect of liability for those who participate in judicial proceedings would weaken the ultimate fairness of the operation of the system itself." *Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766, 772 (4th Cir. 2018) (internal citation and quotations omitted). Accordingly, facing litigation for one's role as a witness—let alone facing intimidation or harassment—is valid grounds to reject the Application. *See United States v. Sealed 1*, 235 F.3d 1200, 1202 (9th Cir. 2000) (holding that a court has "considerable discretion" to deny § 1782 requests intended to "harass [a foreign government's] political opponents"); *Islamic Republic of Pakistan v. Arnold & Porter Kaye Scholer LLP*, 2019 WL 1559433, at *8 (D.D.C. Apr. 10, 2019) (noting that § 1782 applications may be rejected if "the foreign proceedings are. . . incompatible with domestic notions of propriety") (internal citations and quotation omitted).

Second, given the history of witness intimidation and malfeasance by the government of Qatar, the District Court erred in concluding that it should not "give much weight" to the threats carried out against individuals associated with the Sotloff Action. JA561. One of those individuals, the translator who attended a meeting with Perles in France, was apparently the victim of a car break-in in which evidentiary materials were stolen and a note in Arabic was left behind which read:

24

"This is a warning."  JA547.  The translator also reportedly received threats by encrypted voice message, including: "Why risk your life for a rotting Jewish corpse?"—apparently a reference to Steven Sotloff.  *Id.*  According to what was reported to French law enforcement, this break-in occurred during the translator's meeting with Perles—apparently as part of a harassment campaign organized, if not at the behest of the Qataris, then at least against the Sotloffs' interests.  *Id*.  And despite the Qataris' calculated efforts to distance themselves from their government, 50% of Bank, for example, is owned by the Qatari government.  JA49 ¶ 33.  It is disingenuous to contend that the history of witness tampering and intimidation by the government of Qatar has no probative value to the safety of individuals in this action—especially when a criminal actor, with a similar *modus operandi* to that utilized by the government of Qatar, JA536-37, reportedly harassed and intimidated an individual connected to this case.

The Court abused its discretion and ruled contrary to the weight of evidence and authority when determining that this factor weighed in favor of the Qataris.

### D.    The Fourth *Intel* Factor Weighs Against Granting The Application Because The Discovery Requests Are Unduly Burdensome

No matter how much the Qataris may try to minimize the importance of the fourth and final *Intel* factor, which assesses whether a discovery request is "unduly intrusive or burdensome," *Intel*, 542 U.S. at 245, it is still one of the essential components of the Supreme Court's *Intel* test and must be addressed in full.  Here,

however, the District Court disposed of the factor without any meaningful analysis. Given that the fourth *Intel* factor counsels strictly against granting the Application, the District Court abused its discretion by deciding otherwise.

Since the beginning of this litigation, Perles' position has always been that this Application is unduly intrusive and burdensome—and the Qataris' feckless attempts to twist Perles' words are unconvincing. The number of requests contained within the Application speaks nothing to their depth and breadth. Despite the Qataris' assertion that they focused "precisely on the source" of the Transfer Record, Answering Br. 8, the Application implicates highly sensitive information that is protected by the Confidentiality Order. The release of the information called for in their requests would be an undue burden because it would invade Perles' attorney work product and endanger the safety of witnesses and Perles' network of associates. The Qataris' contention that their discovery requests are not unduly burdensome would be tantamount to asking the U.S. government to reveal the identity of a CIA informant and justifying this request on the fact that the government was only asked *one* question. This error alone is grounds for reversal. *See Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 247-48 (2d Cir. 2018) (holding that the district court abused its discretion in granting the § 1782 application because it failed to consider the "respect owed to confidentiality orders").

## **<u>CONCLUSION</u>**

For the foregoing reasons, the District Court's order should be reversed and the Application denied.


Dated: April 28, 2025                    Respectfully submitted,

                                   */s/ Robert F. Serio*
                                   Robert L. Weigel
                                   Robert F. Serio
                                   GIBSON, DUNN & CRUTCHER
                                   LLP
                                   200 Park Ave, 47th Floor
                                   New York, NY 10166-0193
                                   (212) 351-4000
                                   rweigel@gibsondunn.com
                                   rserio@gibsondunn.com

                                   Max E. Schulman
                                   GIBSON, DUNN & CRUTCHER
                                   LLP
                                   1700 M Street, N.W.
                                   Washington, D.C. 20036-4504
                                   (202) 955-8500
                                   mschulman@gibsondunn.com

                                   *Counsel for Respondent-Appellant*
                                   *Perles Law Firm, P.C.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6460 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point, Times New Roman font.


Dated:  April 28, 2025                     */s/ Robert F. Serio*
                                            Robert F. Serio
                                            GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Ave, 47th Floor
                                            New York, NY 10166-0193
                                            (212) 351-4000
                                            rserio@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2025, I served a copy of the foregoing brief on all counsel of record via this Court's CM/ECF system.

Dated: April 28, 2025

*/s/ Robert F. Serio*
Robert F. Serio
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave, 47th Floor
New York, NY 10166-0193
(212) 351-4000
rserio@gibsondunn.com